## In re: JP MORGAN CHASE SECURITIES LITIGATION

No. 02 Civ. 1282(SHS).

United States District Court, S.D. New York.

March 28, 2005.

Ira M. Press, Pamela Elizabeth Kulsrud, Kirby, McInerney & Squire, L.L.P., New York City, Lionel Z. Glancy, Michael Goldberg, Los Angeles, CA, Neal A. Dublinsky, Glancy & Binkow, L.L.P., Los Angeles, CA, for Brian Barry on behalf of the Barry Family LP, individually, and on behalf of all others similarly situated, Plaintiff.

Christopher J. Gray, Law Office of Christopher J. Gray, P.C., New York City, Christopher Lovell, Lovell & Stewart, L.L.P., New York City, Steve W. Berman, Hagens, Berman L.L.P., Seattle, WA, Steven C. Mitchell, Hagens Berman & Mitchell, PLLC, Phoenix, AZ, for ECA & Local 134 IBEW Joint Pension Trust of Chicago, Movant.

Ira M. Press, Kirby, McInerney & Squire, L.L.P., New York City, for Joseph Gregory, Movant.

*OPINION & ORDER*

STEIN, District Judge.

## TABLE OF CONTENTS

I. Background .................................................602
 A. Overview .............................................602
 B. The Parties ..........................................603
 C. The Alleged Scheme....................................603
 1. The Mahonia Transactions .........................603
 2. LJM2 .............................................606
 D. The Fall of Enron ....................................607
 E. JPM Chase's Alleged Misstatements and Omissions ......608
 1. Allegedly Improper Accounting for the Mahonia Transactions as
 Trades Rather Than as Loans and as Viable Rather than Impaired.....609
 a. Mahonia Transactions Should Allegedly Have Been Booked as
 Loans, Not Trades ...........................609
 b. The Mahonia Assets Were Allegedly Non-performing ..............610
 2. Alleged Failure to Disclose Legal and Financial Liability ................611

 3. Representations Regarding Integrity and Risk Management . . . . . . . . . . . . . 612
 4. Analysts' Buy Ratings for Enron Stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 613
 5. JPM Chase's Alleged Downplaying of its Enron-related Exposure . . . . . . . . 613

II. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 615
 A. Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 615
 1. Motion to Dismiss the Amended Complaint Pursuant to Fed.R.Civ.P.
 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 615
 2. Pleading Requirements of Fed.R.Civ.P. 9(b) and the PSLRA . . . . . . . . . . . . 615
 B. Plaintiffs' Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 616
 C. Securities Fraud in Violation of Sections 10(b) and 20(a) of the Exchange
 Act and Rule 10b–5 Promulgated Thereunder . . . . . . . . . . . . . . . . . . . . . . . . . 616
 1. Mismanagement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 617
 2. Why the Alleged Misstatements and Omissions Were Fraudulent . . . . . . . . 618
 3. Scienter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 618
 a. Motive and Opportunity to Commit Fraud . . . . . . . . . . . . . . . . . . . . . . . . . 619
 b. Alleging Facts That Constitute Strong Circumstantial Evidence
 of Conscious Misconduct or Recklessness . . . . . . . . . . . . . . . . . . . . . . . . . 623
 4. Material Falsity of The Alleged Misstatements . . . . . . . . . . . . . . . . . . . . . . . . 625
 a. Allegedly Improper Accounting for the Mahonia Transactions . . . . . . . 626
 b. Failure to Disclose Alleged Improprieties in Connection with the
 Mahonia and LJM2 Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 632
 c. Representations Regarding Integrity and Risk Management . . . . . . . . 632
 d. Analysts' Buy Ratings for Enron Stock . . . . . . . . . . . . . . . . . . . . . . . . . . . 633
 e. JPM Chase's Alleged Downplaying of Its Enron-related
 Exposure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 634
 5. Dismissal of the Section 10(b) Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 634
 D. Section 11 of the Securities Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 635
 E. Section 15 of the Securities Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 635
 F. Section 14(a) of the Exchange Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 636

III. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 636

This consolidated litigation has been brought as a class action against J.P. Morgan Chase & Co. and arises from the infamous implosion of the Enron Corporation. Plaintiffs, a proposed class of J.P. Morgan Chase & Co. shareholders, seek to recover losses they suffered due to that bank's alleged misrepresentations concerning its transactions with Enron. Specifically, plaintiffs bring claims pursuant to Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77o, and Sections 14(a), 10(b) and 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78n(a), 78j(b), 78t(a) and 78t–1.

Plaintiffs charge that J.P. Morgan Chase & Co. and two of its officers—defendants William Harrison, Jr. and Marc J. Shapiro—made misleading statements regarding J.P. Morgan Chase & Co.'s exposure to Enron-related liabilities in various public communications, including a joint proxy statement filed in anticipation of Chase Manhattan's acquisition of J.P. Morgan. Defendants have brought a motion to dismiss plaintiffs' First Amended and Consolidated Class Action Complaint for Violations of Federal Securities Laws ("Amended Complaint") for failure to state a claim for relief pursuant to Fed.R.Civ.P. 12(b)(6), and for failure to comply with the heightened pleading standard that Fed. R.Civ.P. 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4, mandate for securities fraud actions. Because plaintiffs have failed to plead scienter in connection with any material misrepresentation or omission with the required particularity, the complaint is dismissed without prejudice to its re-pleading.

## I. BACKGROUND

### A. Overview

Plaintiffs bring this action on behalf of those who purchased securities in The Chase Manhattan Corp. ("Chase") between November 8, 1999 and December 31, 2000, as well as those who purchased securities in J.P. Morgan Chase & Co. ("JPM Chase") between January 2, 2001 and July 23, 2002.[1] (Am.Compl.¶ 1). JPM Chase was formed when Chase acquired J.P. Morgan & Co. ("JP Morgan") at the end of 2000. (*Id.*).[2] The factual allegations in the Amended Complaint, which are recounted below, are accepted as true for the purposes of this motion to dismiss the complaint. *See In re Carter–Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 38 (2d Cir.2000).

Plaintiffs allege that during the class period, JPM Chase made various assertions, including public comments, financial statements and filings with the Securities and Exchange Commission ("SEC"), that omitted and misrepresented material information relating to transactions in which the bank provided Enron credit disguised as revenue from prepaid commodity trades ("prepays"). According to the Amended Complaint, by 2001, JPM Chase had arranged eight such prepays with Enron, totaling $3.7 billion in value. (Am. Compl.¶ 65).

During the class period, JPM Chase allegedly helped structure and finance Special Purpose Entities ("SPEs") so that Enron could conceal debt that would otherwise have appeared on its balance sheet. (*Id.* ¶ 42). With JPM Chase's allegedly knowing collusion, Enron characterized loans as revenue, and thereby obscured its actual financial position behind the specter of healthy cash flow and a manageable debt burden. (*Id.* ¶ 61). Meanwhile, JPM Chase's analysts issued allegedly false and misleading positive reports that designated Enron's stock a "buy." (*Id.* ¶ 51). Essentially, plaintiffs allege that JPM Chase complicitly participated in a Ponzi scheme—by loaning Enron huge amounts of money and falsely perpetuating the appearance that Enron was financially healthy, JPM Chase generated substantial fees and induced the infusion of fresh capital into Enron. (*Id.* ¶¶ 49–50; 81).

Plaintiffs allege that JPM Chase enjoyed various benefits from participating in Enron's scheme. First, the non-sustainable revenue artificially inflated the price of JPM Chase stock, which JPM Chase allegedly planned to use in stock-for-stock acquisitions of other financial institutions. (*Id.* ¶¶ 457–58). Second, JPM Chase received underwriting, consulting and commitment fees, as well as interest and other payments. (*Id.* ¶¶ 43–49). These fees were allegedly greater than those paid in typical lending arrangements. (*Id.* ¶ 55). JPM Chase allegedly hoped to receive even greater remuneration by marketing its prepay services to other companies. (*Id.* ¶¶ 484–88). Third, as a result of artificial stock price inflation, the individual defendants received large performance-based bonuses. (*Id.* ¶¶ 462–68). Fourth, JPM Chase minimized its own exposure by enticing others to sink fresh capital into Enron. (*Id.* ¶¶ 49–50). JPM Chase also allegedly sought to protect the hundreds of millions of dollars worth of credit default put options it had written on Enron's pub-

---

1. After December 31, 2000, shares of Chase were no longer traded; on January 2, 2001 the combined entity's shares were first offered for sale on the market.

2. For simplicity's sake, when there is no relevant distinction for the purposes of this analysis, the Court refers to both Chase—the pre-merger entity—and the post-merger combined corporation as JPM Chase.

licly traded debt. (*Id.* ¶ 51). To avoid massive exposure, JPM Chase had to keep Enron from defaulting within the time period covered by those puts. (*Id.*). Fifth, Enron allegedly gave JPM Chase and its executives a "kickback"; specifically, the opportunity to invest in LJM2, a lucrative partnership. (*Id.* ¶ 43).

The Amended Complaint charges that throughout the class period, defendants' knowing misrepresentations artificially inflated the price of JPM Chase stock above its inherent value and defrauded the members of the proposed class. (*Id.* ¶ 24). JPM Chase shareholders were allegedly unable to appreciate the nature and extent of JPM Chase's dealings with Enron, until July 23, 2002, when testimony during a Senate Permanent Subcommittee on Investigations ("the Senate Subcommittee") hearing on the role of financial institutions in Enron's collapse cast light on these practices of JPM Chase. (*Id.* ¶ 21). Over time, as news of JPM Chase's Enron-related exposure became public, JPM Chase's share price fell from a high of around $41 per share in July of 2001—a year before the Senate Subcommittee hearings—to around $20 per share on the first day of the Senate Subcommittee hearings, to around $18 per share in September of 2002, when plaintiffs filed the Amended Complaint. (*Id.* ¶¶ 22; 372). Plaintiffs claim that the fall in stock price reflected not only direct financial loss, but also surrendering of the "reputation premium" for integrity that JPM Chase had previously enjoyed. (*Id.* ¶ 24).

## B. The Parties

This Court has previously consolidated various actions and appointed lead plaintiffs: ECA & Local 134 IBEW Joint Pension Trust of Chicago, a labor union-sponsored pension trust that purchased JPM Chase shares; Penn Security Bank &

Trust Co., a bank that purchased shares of JPM Chase and also acquired shares of JPM Chase in exchange for the shares of JP Morgan it held at the time of the formation of JPM Chase; and Empire Life Insurance Co., an insurance company that purchased shares of JPM Chase. (*Id.* ¶¶ 29–31). Defendants are JPM Chase, one of the largest banks in the United States, William Harrison, Jr., President and Chief Executive Officer of Chase before the merger and of JPM Chase after the merger, and Marc. J. Shapiro, Vice Chairman of Chase before the merger. (*Id.* ¶¶ 32–37).

## C. The Alleged Scheme

Chase first orchestrated prepays for Enron in 1992. (*Id.* ¶ 65). At that time, the transactions were designed to help Enron timely claim tax credits that were nearing expiration. (*Id.*). By the mid 1990s, Enron discovered that it could employ prepays to perform financial alchemy—conversion of debt into revenue. (*Id.*). Plaintiffs claim that JPM Chase knowingly assisted Enron, selling it "accounting fraud packages[.]" (*Id.* ¶ 55). JPM Chase allegedly hid from its shareholders the lack of sustainability of these transactions, as well as the massive contingent liabilities and the threat to JPM Chase's reputation for integrity that the transactions caused. (*Id.* ¶ 57). JPM Chase also failed to set aside loss reserves to reflect that these transactions were, according to plaintiffs, impaired assets. (*Id.* ¶ 258).

### 1. The Mahonia Transactions

A number of allegedly sham transactions were carried out through companies, such as Mahonia Ltd. and Mahonia Natural Gas Ltd., that JPM Chase formed and operated. (*Id.* ¶ 58, 70). JPM Chase allegedly structured prepays between the Mahonia

entities and Enron (the "Mahonia transactions") to help "Enron to obtain an inflated credit rating by manipulating Enron's operating cash flow and the amount of its balance sheet debt." (*Id.* ¶ 61). Plaintiffs contend that JPM Chase's purposeful involvement in this scheme is evidenced by JPM Chase's "(1) making Mahonia[,] its controlled, off-shore, shell corporation[,] available for Enron's accounting manipulations; (2) charging exorbitant 'advisory' fees for the exploitation of Mahonia transactions by Enron; and (3) providing the 'disguised loan' financing to enable the Mahonia 'prepay' transactions." (*Id.* ¶ 59).

To generate cash for Enron, JPM Chase loaned money to Mahonia in exchange for a commitment to deliver a fixed amount of gas at specified dates. (*Id.* ¶ 67). Mahonia and Enron then executed a mirror deal—Enron would get the same amount of funds from Mahonia that Mahonia had received from JPM Chase, and Enron would agree to deliver the same amount of gas to Mahonia that Mahonia owed to JPM Chase. (*Id.* ¶ 68). Simultaneously, Enron and JPM Chase struck a commodity swap agreement, pursuant to which Enron hedged against price fluctuation in the gas. (*Id.* ¶ 69). Essentially, Mahonia borrowed money from JPM Chase and used that money to buy gas from Enron; Mahonia would then satisfy its debt to JPM Chase by providing the gas to JPM Chase, which would resell the gas at a fixed future price back to Enron. In reality, according to the Amended Complaint, neither the physical commodity nor title to it were ever intended to be transferred. (*Id.* ¶¶ 69, 74). The series of simultaneous transactions en-abled JPM Chase to avert any price-risk inherent in the transfer of the commodity (*id.* ¶ 73), allegedly leaving the parties with a loan in which JPM Chase provided Enron a sum of money in exchange for repayment of a greater fixed amount at a later date. (*Id.* ¶ 74).

Between 1997 and 2000, Chase arranged more than $3.5 billion in these Mahonia transactions. (*Id.* ¶ 89). The transactions tended to be for around $150 million until the summer of 1999, when Enron sought increasingly large prepays, including one for $500 million. (*Id.* ¶ 83). JPM Chase also allegedly structured at least nine similar transactions for other energy companies. (*Id.* ¶ 94).

JPM Chase endeavored to secure insurance to protect against the risk that Enron would default on its obligations arising from the Mahonia transactions. (*Id.* ¶ 85). Accordingly, surety bonds were obtained from eleven insurance companies to cover JPM Chase's exposure. (*Id.*).[3] Following Enron's bankruptcy, the eleven insurers refused to make payments to compensate JPM Chase for the $2.6 billion Enron still owed it in connection with the Mahonia transactions. (*Id.* ¶ 90). The dispute over the surety bonds has been litigated in other actions between JPM Chase and its insurance carriers. (*Id.* ¶ 90); *see, e.g., Mahonia v. WestLB,* No.2001/1400 (Q.B. Aug. 3, 2004); *JPMorgan Chase Bank ex. rel. Mahonia Ltd. v. Liberty Mut. Ins. Co.,* 189 F.Supp.2d 24 (S.D.N.Y.2002).

Plaintiffs allege that in actively assisting Enron to hide debt, JPM Chase mischaracterized the transactions in its own finan-

---

**3.** It is unclear from the complaint whether JPM Chase itself obtained these contracts (*see* Am. Compl. ¶¶ 13, 85 (discussing the fact that JPM Chase acquired surety contracts)), or whether Enron obtained them on JPM Chase's behalf. (*see id.* ¶ 326 (quoting a January 25, 2002 *Wall Street Journal* article, which stated that "Enron arranged these contracts for J.P. Morgan—and paid the insurance companies for it—so that the bank would feel more comfortable making increasingly large trades with the energy company, according to persons familiar with the arrangement.")).

cial reports, thereby violating Generally Accepted Accounting Principles ("GAAP") and SEC regulations. (*Id.* ¶¶ 77, 80).

In addition to the structure of the transactions themselves, various JPM Chase communications allegedly demonstrate the bank's knowledge that the Mahonia prepays were actually loans and not trades. These are:

- A 1998 Chase "pitch book" for selling these transactions, which described them as being "[b]alance sheet 'friendly'" and an "[a]lternative source of finance[.]" (*Id.* ¶¶ 97, 361). It also explained that the transactions have an "[a]ttractive accounting impact by converting funded debt into 'deferred revenue' or long-term trade payable." (*Id.* ¶ 361).

- An internal Chase email, dated November 25, 1998, which stated, "Enron loves these deals as they are able to hide funded debt from their equity analysts because they (at the very least) book it as deferred rev[enue] or (better yet) carry it in their trading liabilities." (*Id.* ¶ 98) (bracketed text in Am. Compl.).

- An August 5, 1999 meeting, discussed in a *Wall Street Journal* article, in which defendant Shapiro was briefed on the bank's trading with energy companies, including the fact that "one reason companies like Enron were entering the complex trades was to carry forward losses and lower tax burdens." (Am.Compl.¶ 326). The article notes that a person familiar with the briefing said that "Mr. Shapiro reviewed the trades and said they were fine." (*Id.*).

- A September 20, 2001 recorded telephone conversation between three JPM Chase employees, including JPM Chase Vice President Robert W. Traband, which included explanations of the prepays as "not hedging, they're just, they're just, they do the back-to-back swap[,]" "a circular deal that goes right back to them[,]" "basically a structured finance[,]" and "amortizing debt." (*Id.* ¶¶ 361, 369).

- A September 13, 2001 recorded telephone conversation among JPM Chase and Enron employees, including JPM Chase Managing Director Jeffrey W. Dellapina, which involved discussions relating to "mak[ing] sure that Mahonia seems independent." (*Id.* ¶¶ 361, 369)

- A June 2002 court filing in an action to collect from the surety bond issuers, in which JPM Chase claimed that those entities knew the "surety bonds were part of financing transactions in which the funds advanced by JPM[ Chase] to Mahonia were ultimately used by Enron for general corporate purposes, not to secure future sources of the oil and gas to be delivered." (*Id.* ¶ 361).

- Testimony by JPM Chase Managing Director Jeffrey W. Dellapina during the Senate Subcommittee hearings, in which he acknowledged that "[w]e were trying to eliminate price risk" when questioned about a specific Mahonia transaction (*Id.* ¶ 365).

Plaintiffs also urge that JPM Chase must have been aware of the nature of these transactions, because it was common knowledge in the accounting community how to structure prepays so that they could be deceptively classified as trades rather than loans. (*See id.* ¶¶ 384–89 (quoting from various Arthur Andersen documents)).

Notwithstanding the specific allegations regarding JPM Chase's knowledge that the Mahonia transactions were not, in fact, bona fide trades, the Amended Complaint contains no specific allegations that the defendants knew the Mahonia transactions

were impaired or non-performing assets. Rather, plaintiffs conclusorily allege that JPM Chase never disclosed the risks of these transactions to its shareholders even though it "was aware or was reckless in not knowing that Enron's financial results were materially misstated as a result [of the prepays], and that Enron's financial condition was an elaborate 'house of cards' that would someday come tumbling down." (*Id.* ¶ 92). Plaintiffs further suggest that JPM Chase knew of the contingent liabilities inherent in the prepay transactions, because it had created these types of structured finance contracts for other companies. (*Id.* ¶¶ 93–99).

### 2. LJM2

In 1999, before the merger that created JPM Chase, LJM2 Co–Investment LLP ("LJM2"), a partnership comprised of 52 limited partners, was formed with nearly $400 million in capital to fund energy and communications related projects. (*Id.* ¶¶ 101–05). The partners included Chemical Investments, Inc., an affiliate of Chase, and J.P. Morgan Partners and Sixty Wall Street Fund, LP, affiliates of JP Morgan. (*Id.*). In addition to taking an equity position in LJM2, Chase also allegedly lent the partnership at least $65 million. (*Id.* ¶ 112).

The Amended Complaint never makes clear how much JP Morgan, Chase or the officers of either of those companies, invested in LJM2.[4] At one point in the Amended Complaint, plaintiffs allege that entities affiliated with Chase and JP Morgan invested a total of $25 million. (*Id.*

¶ 105) The Amended Complaint elaborates as follows:

> As JPM[ Chase] told the [Senate] Committee, one of the investment partnerships established by J.P. Morgan for its senior officers, known as Sixty Wall Street Fund, L.P. ("Sixty Wall"), invested $3 million to [sic] LJM2 in 1999. J.P. Morgan made additional investments at this time, which, together with the Sixty Wall investments, brought the total J.P. Morgan-related investments in LJM2 to $15 million. Separately, Chase, "through an affiliate," invested $10 million as a limited partner in LJM2. According to JPM[ Chase], J.P. Morgan, together with its officer's investment arm, Sixty Wall, received a 3.8% interest in the LJM2 partnership and Chase received a 2.5% interest.

(Am. Compl. ¶ 460 (footnotes omitted)).[5] The Amended Complaint also charges conclusorily that "top executives of JPM[ Chase] were permitted to personally invest at least $25 million in the lucrative LJM2 partnership as a reward to them for orchestrating JPM[ Chase]'s participation in the Enron fraud" (*id.* ¶ 43; *see also id.* ¶ 116). The Amended Complaint fails to explain whether the $25 million that the executives allegedly invested personally is the same $25 million that the partnerships affiliated with the banks allegedly invested.

Plaintiffs contend that with the involvement of Andrew Fastow, who was Enron's Chief Financial Officer and an LJM2 investor, Enron and LJM2 consummated

---

4. Plaintiffs conclusorily allege that JPM Chase and other banks allegedly funded LJM2 on an expedited schedule at the end of 1999, so that Enron could use LJM2 to manufacture phony revenue for meeting year-end earnings estimates. (*Id.* ¶¶ 117, 129).

5. With respect to the alleged $3 million investment in LJM2 that JP Morgan made through Sixty Wall Street Fund, L.P., which was allegedly "created for" its executives (*id.* ¶ 460), the complaint never defines the phrase "created for[,]" nor does it link the alleged pre-merger investment on behalf of JP Morgan executives to Chase or JPM Chase.

various sham transactions that hid the ownership risks of many of Enron's assets from its shareholders. (*Id.* ¶¶ 102; 113–15). Without specifically alleging how the LJM2 transactions operated, plaintiffs claim that in some of those transactions, Enron sold assets to LJM2 and recognized revenue, even though Enron was essentially selling assets to itself. (*Id.* ¶ 103). Plaintiffs allege that because LJM2 received lucrative fees from Enron in connection with these transactions, "investment [in LJM2] was virtually guaranteed to produce extremely good returns[,]" so the opportunity to invest was reserved for "certain favored investment banks and/or high-level officers of those investment banks." (*Id.* ¶ 113–14). The alleged virtual guarantee of profit from investment in LJM2 derived from "Enron Chief Financial Officer Andrew Fastow's dual role, by which he could self-deal on behalf of the partnership with Enron's assets." (*Id.* ¶ 113).

Plaintiffs claim that JPM Chase's involvement in LJM2 demonstrates the bank's knowledge of the actual state of Enron's financial health. Plaintiffs contend that in performing the requisite due diligence in connection with financing LJM2, JPM Chase would have learned of Enron's actual financial situation. (*Id.* ¶ 112). Plaintiffs point to LJM2's annual meeting on October 26, 2000. Chase Capital, an affiliate of Chase, and J.P. Morgan Capital, an affiliate of JP Morgan, were listed as attendees. (*Id.* ¶ 106). At that meeting, a presentation package disseminated to the attendees outlined why Enron needed LJM2. (*Id.* ¶¶ 106–07). That package explained that Enron sought to "deconsolidate assets" and to "create structures which accelerate projected earnings and cash flows." (*Id.* ¶ 107). Plaintiffs urge that the obvious meaning of these stated goals was the distortion of the asset and liability picture on Enron's balance sheet. (*Id.*). Plaintiffs cite the presentation package as evidence that the JPM Chase affiliates attending the LJM2 annual meeting would have been aware of Enron's deceptive accounting practices. (*Id.* ¶¶ 107–11). For example, the package included a chart showing that although Enron's reported "Total Assets" were $33.3 billion, the "Total Assets and Combined Assets of Unconsolidated Affiliates" were in excess of $60 billion. (*Id.* ¶ 108). The package also included a description of the "Raptor III" transaction, in which Enron allegedly hid the volatility of an investment by engaging in a hedging transaction with LJM2. (*Id.* ¶ 111).

### D. The Fall of Enron

Plaintiffs allege, in vague terms, that Enron participated in forward contracts for the purchase of its own stock that purportedly resulted in embedded value, which Enron then used to capitalize SPEs that would engage in transactions to hedge potential Enron losses. (*Id.* ¶ 137). In other words, Enron formulated complex derivative transactions between itself and the SPEs in an effort to hedge its risk, but because the SPEs were essentially capitalized with Enron stock, Enron "was only 'hedging' the transactions with itself." (*Id.*). As numerous Enron investments soured, the SPEs grew unable to meet their mounting obligations, particularly given that they were funded with Enron stock that was declining in value. (*Id.* ¶ 140).

In the third quarter of 2001, Enron purchased LJM2's equity position in several SPEs, denominated Raptor I, Raptor II, Raptor III and Raptor IV, for $35 million, accounting for the transaction as a reduction to shareholders' equity and notes receivable of $1.2 billion. (*Id.* ¶ 145). That correction of the improper accounting for the initial funding of the Raptor entities began Enron's implosion. In reporting its

financial results for the third quarter of 2001, on October 16, 2001, Enron announced a $1.01 billion charge, resulting in a $618 million loss. (*Id.* ¶¶ 307–08).

In the wake of this earnings report, on October 17, 20 and 23, JPM Chase analysts issued "buy" ratings for Enron stock and expressed confidence in the company's sustainable earnings notwithstanding the recent loss. (*Id.* ¶¶ 310–13). On November 19, 2001, after having amended its financial statements for 1997 through 2000 to reduce net income as previously reported for that period by an aggregate of $586 million (*id.* ¶ 314), Enron filed its third quarter form 10–Q, which reported total debt of $12.978 billion (*id.* ¶ 315). On the same day as the 10–Q filing, at the Waldorf Astoria hotel in New York City, Enron's executives allegedly met with representatives of Enron's financing banks and disclosed that Enron's debt was, in reality, $38.094 billion, $25.116 billion of which was "off balance sheet," including $4.822 billion in "[c]ommodity [t]ransactions with [f]inancial [i]nstitutions[.]" (*Id.* ¶ 316). Two weeks later, on December 2, 2001, Enron filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York.

The following summer, in July of 2002, the Senate Subcommittee conducted the hearings on the role of financial institutions in the collapse of Enron. The first day of hearings, July 23, was, according to plaintiffs, when accurate information first surfaced regarding JPM Chase's dealings with Enron; consequently, that is the end of the class period in this litigation. (*Id.* ¶ 357). During the hearings, the Chief Investigator for the Subcommittee, Robert Roach, and Senators Carl Levin and Susan Collins chastised JPM Chase and other banks for formulating transactions that disguised loans as trades. (*Id.* ¶¶ 358–61).

Roach informed the committee that "the documents that we have reviewed show that the financial institutions clearly understood what Enron's objective was in engaging in these transactions." (*Id.* ¶ 362). Another witness, the former Chief Accountant of the SEC, Lynn Turner, expressed his belief that the banks planned the prepay transactions "for the purpose of reducing Enron's transparency to investors and the investment banker's risk." (*Id.* ¶ 364). On July 23, 2002—the first day of the Senate hearings and the end of the proposed class period in this litigation—the price of JPM Chase fell 18.7% from $24.52 per share to $20.08 per share. (*Id.* ¶ 372).

### E. JPM Chase's Alleged Misstatements and Omissions

Plaintiffs allege that defendants made a number of misstatements and omissions in connection with their role in financing Enron-related entities. Many of these alleged misstatements were contained in SEC filings, beginning with the quarterly 10–Q form that Chase filed with the SEC on November 8, 1999, the first day of the class period. Plaintiffs contend that that 10–Q, which purported to comply with GAAP, omitted disclosure of JPM Chase's substantial financial vulnerabilities in connection with Enron. Specifically it "(i) failed to record any contingent liability for probable losses from the Mahonia and other transactions with Enron; (ii) improperly accounted for the Mahonia and other 'prepay' transactions as 'trades' rather than 'loans'; and (iii) failed to make the required disclosures about credit risk related to the Mahonia transactions, as was required by GAAP and SEC Regulations." (*Id* ¶¶ 149, 151). Consequently, plaintiffs claim JPM Chase overstated net income, understated loan assets and failed to provide important information about Enron's outstanding obligations. (*Id.* ¶ 152). In the filing, JPM Chase allegedly emphasized its own integrity and risk management proce-

dures, even though its alleged participation in fraudulent transactions exposed it to significant reputation cost and legal liability. (*Id.* ¶¶ 153–57; 161–62).

Plaintiffs make substantially similar allegations regarding a series of Chase and JPM Chase public disclosures.[6] One of those disclosures is the Joint Proxy Statement and Prospectus that Chase and JP Morgan filed on November 21, 2000 in anticipation of Chase's acquisition of JP Morgan. Plaintiffs locate additional alleged misstatements and omissions in various public statements, analysts' reports and press releases. The alleged misstatements and omissions are discussed below in the following categories: 1) allegedly improper accounting for the Mahonia transactions as viable trades rather than as impaired loans; 2) failure to disclose alleged violations of the law in connection with the Mahonia and LJM2 Transactions; 3) representations regarding integrity and risk management; 4) analysts' "buy" ratings for Enron stock; and 5) JPM Chase's alleged downplaying of its Enron-related exposure.

1. *Allegedly Improper Accounting for the Mahonia Transactions as Trades Rather Than as Loans and as Viable Rather than Impaired*

a. *Mahonia Transactions Should Allegedly Have Been Booked as Loans, Not Trades*

Plaintiffs allege that JPM Chase should have accounted for the Mahonia prepay transactions as loans rather than as trades and as impaired assets rather than viable ones. Plaintiffs maintain that various JPM Chase SEC filings contain GAAP violations as a result of the misleading characterizations of these transactions. Allegedly, defendants failed to comply with the strictures of Financial Accounting Standard 133, because: 1) the parties to the Mahonia transactions were not independent; 2) the trades among the three parties were linked; 3) the trades entailed no price risk; and 4) the trades did not involve a legitimate business reason. (*Id.* ¶¶ 378–80). In addition, plaintiffs allege that JPM Chase failed to make required footnote disclosures regarding potential off-balance sheet losses. (*Id.* ¶¶ 408–09).

i. *Independence*

JPM Chase allegedly created Mahonia[7] for the purpose of offering clients structured financing products. (*Id.* ¶ 393). According to the complaint, Mahonia, which had no employees, office or independent business purpose, was capitalized with only £10,000 and operated by Chase. (*Id.* ¶¶ 393, 397). A single island of Jersey law firm, Mourant du Feu & Jeune, allegedly not only created Mahonia and a trust, Eastmoss Charitable Trust, that owned Mahonia, but also served as the trustee of Eastmoss. (*Id.* ¶ 394). For each prepay transaction, Mahonia allegedly provided Chase, which acted as Mahonia's agent, a

---

**6.** In addition to the November 8, 1999 10–Q, the allegedly offending SEC filings were the 10–K Chase filed on March 13, 2000, the 10–Q Chase filed on May 15, 2000, the 8–K Chase filed on June 19, 2000, the 10–Q Chase filed on August 14, 2000, the 10–Q Chase filed on November 14, 2000, the Joint Proxy Statement Chase and JP Morgan filed on November 21, 2000, the earnings announcement JPM Chase issued on January 18, 2001, the 10–K JPM Chase filed on March 31, 2001, the

10–Q JPM Chase filed on May 15, 2001, the 10–Q JPM Chase filed on August 14, 2001, the 10–Q that JPM Chase filed on November 14, 2001, the 10–K that JPM Chase filed on March 22, 2002 and the 10–Q that JPM Chase filed on May 15, 2002.

**7.** It is not clear in the complaint to which of the Mahonia entities this refers.

lien on all rights to receive whatever commodity was supposedly being traded. (*Id.* ¶ 396–97).

### ii. Trades Among the Three Parties Were Linked

The various trades involved in each of the prepay transactions were allegedly "simultaneously conceived and implemented...." (*Id.* ¶ 399).

### iii. Elimination of Price Risk

Plaintiffs maintain that the commodity swaps arranged in connection with the prepay transactions "effectively exchanged any Chase profit (or loss) on the natural gas price fluctuation for a fixed payment from Enron." (*Id.* ¶ 401). Chase earned a profit that did not depend on the price of the commodity being traded. (*Id.* ¶ 402). According to the Amended Complaint, other evidence of the elimination of price risk included that Mahonia did not exercise margin calls that Enron owed it—because Mahonia saw no variation in its profit from market fluctuations in the price of the commodity—and that the pricing of the transactions was based on LIBOR, conventionally used for pricing bank loans, not commodities. (*Id.*). In addition, during testimony before the Senate subcommittee, Jeffrey Dellapina, a Managing Director at JP Morgan Chase, admitted with respect to one specific Mahonia transaction that "[w]e were trying to eliminate price risk." (*Id.* ¶ 365).

### iv. Reason for the Purported Trades

Plaintiffs claim that the complex Mahonia trading structure served no purpose other than to permit Enron to hide its debt obligations to Chase. (*Id.* ¶ 403).

### b. The Mahonia Assets Were Allegedly Non-performing

Plaintiffs contend JPM Chase violated GAAP principles, as set forth in Financial Accounting Standards 105, 107, 114 and 119, as well as SEC Staff Accounting Bulletins 99 and 102, by failing to report the sums that Enron-related entities owed it as non-performing or non-accrual. (*See, e.g., id.* ¶¶ 179–84, 259–60; 420–21). By virtue of its working relationship with Enron, JPM Chase allegedly knew or should have known of Enron's fragile financial health and reflected that knowledge in its own accounting. (*See, e.g., id.* ¶¶ 100–41). Specifically, plaintiffs urge that as early as 2000, the Mahonia transactions were "doubtful" loans that should have been classified as impaired and been reflected in JPM Chase's credit loss allowance. (*See, e.g., id.* ¶¶ 255–58).

JPM Chase "actively assisted Enron in concealing the very cash flow numbers that were necessary to accurately compute impairment pursuant to GAAP." (*Id.* ¶ 436). "Since most of the JPM[ Chase] Enron credit arrangements were either unsecured or directly or indirectly secured by Enron stock (the value of which correlated, to a large degree, to the cash flow and balance sheet debt of Enron), the assessment of credit risk and loss, required by regulatory and accounting principles, depended heavily on the very financial criteria JPM[ Chase] was intrinsically involved with Enron in manipulating." (*Id.* ¶ 422; *see also id.* ¶¶ 423–26). Consequently, JPM Chase "could not compute loan impairment on the Enron credit facilities so long as JPM[ Chase] assisted Enron in providing cash flow numbers that were overstated and completely unreliable." (*Id.* ¶ 436). Rather, JPM Chase allegedly "should have used appropriately adjusted (downward) cash flow projections [for Enron] which, if JPM[ Chase] had been forthcoming, would have reflected its substantial inherent losses in the Enron credits." (*Id.* ¶ 439). By not doing so,

JPM Chase allegedly failed to monitor properly Enron's ability to meet its obligations. (*Id.* ¶¶ 431–32).

Plaintiffs conclusorily allege that JPM Chase "knew that it was probable that Enron's Ponzi scheme would come to an end, leaving it unable to pay for its massive outstanding loans—including the Mahonia transactions[.]" (*Id.* ¶ 407). JPM Chase allegedly should have accounted for the probable losses, because the "amount of the losses could be reasonably estimated as the balances outstanding to Enron in the Mahonia and other loans." (*Id.*). The failure to meet this obligation allegedly led JPM Chase to issue misleading statements when claiming to have set aside adequate reserves for impaired assets and to have followed proper accounting procedures. (*See, e.g., id.* ¶¶ 261–64).

Plaintiffs claim that the existence of surety contracts that guaranteed the Mahonia transactions did not relieve JPM Chase of the obligation to treat the Mahonia transactions as non-performing. Allegedly, JPM Chase should have booked the Mahonia transactions as unsecured and non-performing, because JPM Chase should have known that the insurance companies would refuse to perform on the surety contracts. (*Id.* ¶¶ 326, 329). Plaintiffs allege the surety contracts were fraudulently obtained in that the underlying transactions were characterized to the insurance companies as trades rather than as loans.

After its insurance carriers challenged the surety contracts, JPM Chase acknowledged that insurance proceeds from the Mahonia surety contracts were subject to litigation. (*Id.* ¶ 18).

### 2. Alleged Failure to Disclose Legal and Financial Liability

JPM Chase allegedly failed to convey to the public that it had violated 18 U.S.C. §§ 215 and 1005. Section 1005 [8] prohibits making false entries in disclosures with the fraudulent intent to deceive government entities or financial institutions. By improperly accounting for the Mahonia transactions and facilitating Enron's similarly inaccurate accounting, as well as by making false statements to syndicated loan participants to entice them to participate in the extension of credit to Enron-related entities, JPM Chase allegedly violated Section 1005. (*See* Am. Compl. ¶¶ 546–52).

JPM Chase executives also allegedly received benefits, specifically the opportunity to invest in LJM2 and other Enron SPEs, in alleged violation of another provision of 18 U.S.C. § 1005 that prohibits the receipt of a benefit through a banking transaction with intent to defraud a governmental entity. (Am.Compl.¶¶ 546–52). The availability of the LJM2 investments to JPM Chase executives also allegedly violated Section 215 [9] of the same title, which es-

---

**8.** Section 1005 provides in relevant part:

Whoever, being an officer, director, agent or employee of any ... member bank ... without authority from the directors of such bank ... makes any false entry in any book, report, or statement of such bank ... with intent to injure or defraud such bank ... or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank ...; or

Whoever with intent to defraud the United States or any agency thereof, or any financial institution referred to in this section,

participates or shares in or receives (directly or indirectly) any money, profit, property, or benefits through any transaction, loan, commission, contract, or any other act of any such financial institution—

Shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

**9.** Section 215 provides in relevant part:

(a) Whoever—
(1) corruptly gives, offers, or promises anything of value to any person, with intent to

sentially prohibits bank officers from taking "kickbacks." (*See id.* ¶¶ 553–55).

Plaintiffs contend JPM Chase failed to disclose the liabilities inherent in these alleged legal infractions. JPM Chase allegedly breached its duty pursuant to SEC Accounting Bulletin 99, which requires disclosure of information deemed material by virtue of qualitative, not merely quantitative, effect on the corporation. (*Id.* ¶¶ 441–47).

### 3. Representations Regarding Integrity and Risk Management

Plaintiffs allege that JPM Chase made a series of misrepresentations by portraying itself as a low-risk company with adequate financial discipline to manage risks. (*See, e.g., id.* 154–57; 168–73). Plaintiffs allege a multitude of such misleading statements; a representative list of examples follows:

- In its form 10–Q filed on November 8, 1999, Chase stated, "The strong 1999 third quarter results continued to demonstrate Chase's disciplined approach to managing capital and making investments that propel future growth." (*Id.* ¶ 155). In that same filing, Chase claimed to "set the standard for best practices in risk management techniques." (*Id.* ¶ 153).

- In its current report on form 8–K filed on June 19, 2000, JPM Chase recounted the substance of a conference call in which it communicated that it had adequate reserves for its non-performing assets. (*Id.* ¶ 198).

- In connection with an earnings announcement on July 18, 2000, defendant Harrison noted that "we will continue to reposition and strengthen our franchises with a focus on fiscal discipline." (*Id.* ¶ 200).

- Chase's 2000 Annual Report noted that JPM Chase set the standard for integrity and that "[d]isciplined management of market, credit and operating risks is fundamental to protecting shareholder value." (*Id.* ¶¶ 268).

- JPM Chase asserted in its 2000 form 10–K that it used its Vulnerability Identification System, so that "[t]raders and others responsible for managing risk positions were accountable for identifying potential 'worst-case' losses and estimating the probability of loss[,]" thereby enabling the bank to "identify material risks and potential earnings vulnerabilities that might not be captured by statistical methodologies." (*Id.* ¶ 275). In that same filing, JPM Chase claimed that its risks were "accurately assessed." (*Id.* ¶ 270).

- JPM Chase's form 10–K filed on March 22, 2002 represented JPM Chase as one of the "world's premier banks[,]" explaining that "integrity, drive, partnership, excellence, insight and reliability permeate everything JPM[ Chase] does." (*Id.* ¶ 333).

- JPM Chase claimed that its various financial filings during the proposed class period were prepared in accordance with GAAP. (*See, e.g., id.* ¶ 340).

---

influence or reward an officer, director, employee, agent, or attorney of a financial institution in connection with any business or transaction of such institution; or
(2) as an officer, director, employee, agent, or attorney of a financial institution ... corruptly accepts or agrees to accept, anything of value from any person, intending to

be influenced or rewarded in connection with any business or transaction of such institution;
shall be fined not more than $1,000,000 or three times the value of the thing ... accepted, or agreed to be accepted, whichever is greater, or imprisoned not more than 30 years, or both. . . .

### 4. Analysts' Buy Ratings for Enron Stock

Despite allegedly knowing the extent of Enron's financial woes, JPM Chase issued "buy" ratings on Enron stock and continued to do so even after public announcements signaling Enron's demise. (*See id.* ¶ 310–13; 531–45).

### 5. JPM Chase's Alleged Downplaying of its Enron-related Exposure

JPM Chase allegedly downplayed its Enron-related exposure by issuing deceptive press releases. In November 2001, JPM Chase acknowledged Enron-related exposure amounting to $500 million in unsecured debt and $400 million in secured debt. (*Id.* ¶ 494). That amount omitted JPM Chase's insured interests in the Mahonia transactions. In a December 19, 2001 press release, after the insurers that had guaranteed those transactions challenged their obligations, JPM Chase disclosed the outstanding insurance receivables that were subject to litigation. (*Id.* ¶ 18).

Plaintiffs claim that the earlier of these statements—which pegged the exposure at $900 million—was false because JPM Chase knew that it faced much greater exposure. (*Id.* ¶¶ 494–95). To support that contention, plaintiffs point to testimony of JPM Chase executives before the Senate Subcommittee in July 2002. In response to a question regarding the amount Enron-related entities owed JPM Chase in May of 2001, a JPM Chase Vice President, Robert W. Traband, answered, "I don't recall specifically how much they

owed us. But I would imagine [sic] was, you know, something greater than $2 billion." (*Id.* ¶ 366). Donald H. McCree, a J.P. Morgan Securities Managing Director, explained further that "we actually increased our credit exposure in a number of different ways through the fall of 2001 prior to the bankruptcy." (*Id.*). Plaintiffs contend that "[g]iven the testimony of Mr. Traband and Mr. McCree, . . . at the time JPM[ Chase] issued its November 28, 2001 press release representing that it had only $900 million in combined exposure to Enron, it actually knew facts and had access to information that it was understating its exposure by an amount well in excess of $1 billion." (*Id.* ¶ 368). Plaintiffs allege further that when questioned about the December correction in the amount of JPM Chase's exposure, JPM Chase Vice Chairman Marc Shapiro said, according to the *New York Times,* "It's not an issue of what we knew, but what was appropriate to disclose." (*Id.* ¶ 496).

Plaintiffs urge that despite disclosing the full $2.6 billion of its exposure in the December 19 press release, JPM Chase intimated that it expected to receive payment on that amount in several subsequent public statements. First, plaintiffs vaguely allege that at a December 20, 2001 conference, the day after the press release was issued, an unidentified employee of JPM Chase represented that JPM Chase's legal position in the dispute with the insurers was correct and that the bank should receive payment from the insurance companies.[10] Second, on March 22, 2002, JPM

---

10. The paragraph of the complaint that recounts these allegations provides:

320. At a conference held on December 20, 2001, JPM[ Chase] officials explained why JPM[ Chase] had increased its stated exposure. The $2.6 billion exposure was characterized as a dispute with various surety companies and that "JP Morgan

Chase believes that ultimately they will be paid because this is the correct legal position." The exposure was also called "normal trading," "bad luck" and that with respect to the surety bond issue that JPM[ Chase] did not expect to take any charges "as it is very likely we will get paid." A JPM[ Chase] executive represent-

Chase's form 10–K treated only $169 million of the bank's Enron-related exposure as unsecured. (*Id.* ¶¶ 328–29, 331). The form acknowledged that $1.1 billion in expected insurance payments were subject to litigation, but JPM Chase did not write down that receivable. (*Id.* ¶ 329). Third, JPM Chase held a news conference for investors on April 6, 2002, during which the company reassured investors that "most of the SPE transactions" were "plain vanilla" and constituted "real economic substance." (*Id.* ¶ 335). Fifth, in May, the form 10–Q that JPM Chase filed with the SEC allegedly overstated net income by not properly accounting for outstanding Mahonia transactions.[11] (*Id.* ¶ 343). That filing allegedly "buried" the outstanding Mahonia exposure in an "innocuous footnote." (*Id.* ¶ 251). Sixth, at a conference the following month, Harrison expressed confidence in his bank, commenting that "he felt 'good about the basic fundamentals of JPM[ Chase],'" which had the "right model" and the "best capabilities of an investment bank." (*Id.* ¶ 345). Harrison lauded JPM Chase's "financial discipline," and he "depicted graphically JPM[ Chase's] exposure as a result of Enron, to be less than $500 [sic]." (*Id.* ¶¶ 346–47).

From June 18, 2002 to July 17, 2002, the price of JPM Chase stock fell from $34 per share to $28. (*Id.* ¶ 348). Plaintiffs contend that "[t]his decline was a direct result of leaks into the market that JPM[ Chase's] involvement in Enron's illegal activities and its financial and reputational exposure were greater than previously represented." (*Id.*). As evidence, plaintiffs quote from July 23 and 24, 2002

Prudential Securities Reports and a July 24, 2002 *Wall Street Journal* article, all of which conveyed market concern about the extent of JPM Chase's Enron-related exposure. (*Id.* ¶¶ 349–51).

Facing mounting negative publicity in the wake of the Senate Subcommittee hearings, JPM Chase responded publicly. During an analyst briefing and a television appearance on July 24, as well as in a press release issued on July 29, JPM Chase executives insisted that the bank had acted properly in connection with its Enron-related transactions. (*Id.* ¶¶ 352–55). Nevertheless, in August 2002, JPM Chase formed a committee to identify and avoid conflicts of interest in specific transactions. (*Id.* ¶ 356).

In September 2002, JPM Chase's Chief Executive Officer, William Harrison, admitted in a speech that the company was attempting to "bottle up" and "mitigate the damage from negative publicity over its relationships with Enron Corp., WorldCom Inc. and other troubled companies[,]" because JPM Chase had made "mistakes of judgments." (*Id.* ¶ 23). That same month Harrison wrote an op-ed in *The Wall Street Journal,* in which he urged that "the notion that bankers were conspiring with Enron executives to hide transactions which date back to 1992 and which were accounted for correctly does not make a lot of sense—especially when the bankers were left with large losses." (*Id.* ¶ 373).

As noted above, plaintiffs have moved to dismiss the Amended Complaint for failure to comply with Fed.R.Civ.P. 12(b)(6) and 9(b), as well as the Private Securities Liti-

---

ed that this was 100% of JPM[ Chase]'s exposure.

**11.** The specific allegations relating to this 10–Q are unclear and confused. Plaintiffs allege, *inter alia,* that "the financial statements in this form 10–Q overstated net income by a

material amount, up to the entire $2.1 billion that was currently outstanding to Enron[.]" (Am.Compl.¶ 343). How plaintiffs arrived at the $2.1 billion figure or why that amount would be owed to Enron are never set forth.

gation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u–4.

## II. Discussion

### A. Standard

#### 1. Motion to Dismiss the Amended Complaint Pursuant to Fed. R.Civ.P. 12(b)(6)

When reviewing a motion to dismiss a complaint for failure to state a claim for relief pursuant to Fed.R.Civ.P. 12(b)(6), a district court may only dismiss plaintiffs' claims if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Drake v. Delta Air Lines, Inc.*, 147 F.3d 169, 171 (2d Cir.1998) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)) (quotation marks omitted). A court must treat all factual allegations in the complaint as true and draw all reasonable inferences in plaintiffs' favor. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000); *Lee v. Bankers Trust Co.*, 166 F.3d 540 (2d Cir.1999).

In considering this motion, the Court is free to review plaintiffs' complaint, including "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been filed with the SEC...." *Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d Cir.2000) (internal citations omitted).[12]

#### 2. Pleading Requirements of Fed. R.Civ.P. 9(b) and the PSLRA

A complaint charging securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure Rule 9(b) and the PSLRA, 15 U.S.C. § 78u–4. *See Kalnit v. Eichler*, 264 F.3d 131, 138. Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The U.S. Court of Appeals for the Second Circuit interprets that rule to require that "[t]he complaint ... identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view they were fraudulent, specifying who made them, and where and when they were made." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69–70 (2d Cir.2001). Though Rule 9(b) permits "[m]alice, intent knowledge and other condition of mind of a person [to] be averred generally[,]" the Second Circuit has admonished that "we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a 'license to base claims of fraud on speculation and conclusory allegations.'" *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995) (quotation marks and citation omitted). Instead, plaintiffs must "allege facts that give rise to a *strong inference of fraudulent intent.*" *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir.1996) (emphasis in original) (quoting *Acito*, 47 F.3d at 52).

The PSLRA mandated a uniform national pleading standard for securities fraud actions that mimics the standard the Second Circuit had derived from Rule 9(b),

---

**12.** The "Third Interim Report of Neal Batson, Court–Appointed Examiner," submitted on June 30, 2003 to the Bankruptcy Court for the Southern District of New York in *In re: Enron Corporation*, No. 01–16034, was in turn provided to this Court by plaintiffs' counsel after the instant motion to dismiss was fully briefed. Because the Batson report was neither relied upon in bringing this action nor referenced in the Complaint, the Court has not taken it into account for the purposes of this motion. *See Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d Cir.2000).

except insofar as the PSLRA requires particularity in the pleading of the requisite mental state.[13] *See Novak v. Kasaks,* 216 F.3d 300, 310 (2d Cir.2000) ("[T]he PSLRA effectively raised the nationwide pleading standard to that previously existing in this circuit and no higher (with the exception of the 'with particularity' requirement.")). Courts must dismiss pleadings that fail to adhere to the requirements of the PSLRA. *See* 15 U.S.C. § 78u–4(b)(3)(A); *see also Novak,* 216 F.3d at 307.

### B. Plaintiffs' Claims

Plaintiffs bring four specific claims: 1) against all defendants for violation of Section 11 of the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. § 77k; 2) against defendant Harrison for violation of Section 15 of the Securities Act, 15 U.S.C. § 77o; 3) against all defendants for violation of Section 14(a) of the Securities and Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78n(a), and Rule 14(a)–9(a) promulgated thereunder, 17 C.F.R. § 240.14a–9(a); and 4) against all defendants for violation of Sections 10(b), 15 U.S.C. § 78j, and 20(a), 15 U.S.C. § 78t(a), of the Exchange Act, as well as Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder.

### C. Securities Fraud in Violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b–5 Promulgated Thereunder

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may proscribe." 15 U.S.C. § 78j. One such rule, Rule 10b–5, prohibits "mak[ing] an untrue statement of material fact or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading...." 17 C.F.R. § 240.10b–5. To bring a cause of action pursuant to these provisions, "a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Lawrence v. Cohn,* 325 F.3d 141, 147 (2d Cir.2003) (quoting *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir.2000)).

Defendants assert three bases for dismissing plaintiffs' Section 10(b) claim. First, they urge that the Amended Com-

---

**13.** The PSLRA provides in relevant part that: [i]n any private action arising under this chapter in which the plaintiff may recover money damages only upon proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2). The statute further provides that,

[i]n any private action arising under this chapter in which the plaintiff alleges that the defendant—made an untrue statement of a material fact;

or

... omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1).

plaint alleges mismanagement of JPM Chase by the defendants, rather than the type of manipulation or deception that the federal securities fraud laws prohibit. Second, they contend that plaintiffs have failed to plead facts supporting a strong inference of scienter. Third, they claim that plaintiffs have failed to allege that the misrepresentations or omissions by defendants were material.

### 1. Mismanagement

■ Section 10(b) of the Securities Act and rules promulgated thereunder apply only to conduct that is "manipulative or deceptive." *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 473–74, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (quoting Section 10(b)). Defendants contend that plaintiffs' allegations do not involve manipulation or deception. Rather, defendants argue, the Amended Complaint charges mismanagement, which cannot be the predicate for Section 10(b) liability. *See id.* at 477, 97 S.Ct. 1292.

In *In re Citigroup, Inc. Securities Litigation*, 330 F.Supp.2d 367, 375 (S.D.N.Y. 2004), Judge Swain dismissed a Section 10(b) claim against Citigroup and its officers for misrepresentations and omissions relating to that bank's role in the collapse of Enron. The plaintiffs in *In re Citigroup* alleged conduct substantially similar to that charged against JPM Chase in the instant litigation. Among the allegations were that Citigroup 1) did not properly account for its prepay transactions with Enron in that it booked those transactions as trades rather than loans; 2) failed to describe the revenues from its prepay transactions as non-sustainable and to provide adequate loan loss reserves for those transactions; 3) had falsely represented its risk management processes and business practices; 4) conveyed misleading information through its analysts' reports on corpo-

rations that were Citigroup clients; and 5) failed to disclose litigation risks and legal violations. The Court in that action concluded that the alleged misconduct did not "rise to the level of depicting manipulative or deceptive conduct within the meaning of the securities laws[,]" *id.* at 376, and held that the plaintiffs' claims against Citibank amounted to nothing more than mismanagement, for which the federal securities do not provide a remedy. *Id.* at 375–78.

■ However, deliberate misrepresentations that impaired loans are instead viable trades can constitute more than mere mismanagement. Although the federal securities laws do not require a corporation to "accuse itself of wrongdoing," *id.* at 377, they do prohibit misrepresentation of material facts, even when those material facts relate to corporate mismanagement. *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 494 n. 11 (S.D.N.Y.2004) ("Although poor business judgment is not actionable under federal securities laws, a plaintiff has alleged more than mere corporate mismanagement when he has adequately alleged that the defendant made false statements concerning historical facts.") (citation and internal quotation marks omitted); *see also Milman v. Box Hill Sys. Corp.*, 72 F.Supp.2d 220, 233 (S.D.N.Y.1999) ("Although managerial incompetence is not a necessary disclosure, a company engaging in the public offering of its shares is under an affirmative obligation to disclose any specific material consequence of that incompetence.").

Plaintiffs have not alleged mere "[p]ost-stock-purchase corporate mismanagement or breach of fiduciary duty[,]" but rather that "a misleading statement regarding the value of a security to be sold .... lulled [them] ... into investing in [JPM Chase] to their loss." *Suez Equity Investors, L.P. v. Toronto Dominion Bank*, 250 F.3d 87, 99 (2d Cir.2001). The Amended Complaint

charges that defendants artificially inflated JPM Chase's stock price by making misrepresentations and omissions that concealed the nature of the transactions the bank had conducted with Enron. This is precisely the type of deception that Section 10(b) prohibits. *See id.* (rejecting the argument that at a Section 10(b) claim alleged mere mismanagement, because "defendants allegedly made an affirmative misrepresentation to plaintiffs, as outside investors, concerning the quality of the proffered securities.").

### 2. Why the Alleged Misstatements and Omissions Were Fraudulent

To state a Section 10(b) claim in compliance with Fed.R.Civ.P. 9(b) and the PSLRA, "a complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir.1999) (citations and internal quotation marks omitted).

Defendants do not claim that plaintiffs' allegations fail to satisfy the first three pleading requirements. With respect to most of the misrepresentations alleged in the Amended Complaint, plaintiffs have complied with the first three particularity requirements by specifying the statements alleged to be fraudulent, the identity of the speaker and the context in which the statements were made. *See In re Globalstar Sec. Litig.*, No. 01 Civ. 1748, 2003 WL 22953163, at *5 (S.D.N.Y. Dec. 15, 2003) (finding that the first three particularity requirements had been met when "the misrepresentations alleged in the ... complaint were made in specifically identified

financial disclosures, news articles, communications with analysts or press releases discussing financial disclosures.").

■ The fourth particularity requirement—setting forth why the statements were fraudulent—requires the plaintiffs to convey through factual allegations that the defendants made materially false statements, and that they did so with scienter. *See id.; In re Revlon, Inc. Sec. Litig.*, No. 99 Civ. 10192, 2001 WL 293820, at *7 (S.D.N.Y. Mar. 27, 2001) (citing *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies Inc.*, 75 F.3d 801, 812–13 (2d Cir.1996)). It is this requirement that defendants claim plaintiffs have not met.

### 3. Scienter

■ The PSLRA mandates that in a securities fraud complaint, plaintiffs "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). For a Section 10(b) claim, the required state of mind is "an intent to deceive, manipulate or defraud." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir.2001) (citations and quotation marks omitted). Plaintiffs cannot satisfy this scienter pleading requirement by alleging facts that give rise to a weak yet reasonable inference of scienter. *See In re Livent Inc., Sec. Litig.*, 148 F.Supp.2d 331, 361 (S.D.N.Y.2001). However, "[i]n determining whether a strong inference of scienter has been pleaded, the Court must read the complaint '*in toto* and most favorably to plaintiff.'" *In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03 Civ. 3111, 2005 WL 225288, at *24 (S.D.N.Y.2005) (quoting *In re Complete Mgmt. Sec. Litig.*, 153 F.Supp.2d 314, 333 (S.D.N.Y.2001)).[14]

---

14. The parties disagree over whether plaintiffs must plead facts that exclude other inferences that are equally plausible to scienter. *Compare In re Brightpoint Sec. Litig.*, No.

■ The Second Circuit permits plaintiffs to establish scienter in one of two ways: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious behavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir.2000) (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir.1995)). Plaintiffs have attempted to employ both means of scienter pleading.

*a. Motive and Opportunity to Commit Fraud*

Plaintiffs have failed to allege motive, which would entail a concrete and personal benefit from the alleged fraud. *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir.2000); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994). Opportunity is "the means and likely prospect of achieving concrete benefits by the means alleged." *Shields*, 25 F.3d at 1128.

■ Defendants, who have not contested their opportunity to commit the alleged fraud, had the means to benefit from defrauding JPM Chase shareholders. Opportunity can be inferred from the ability of the officers of JPM Chase to obtain confidential financial information unavailable in the market. *See Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 86 (2d Cir.1999) (" 'Opportunity' can be inferred from the [defendants'] officers' access to financial information . . . to which the general public did not have access.").

■ Defendants maintain that they did not have a legally cognizable motive to commit the alleged fraud. "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir.2001).[15] For example, "the desire for the corporation to appear profitable and . . . the desire to keep stock prices high to increase officer compensation" are insufficient motives, whereas the desire "to inflate stock prices while [defendants] sold their own shares" may support a viable claim. *Id.; see also Novak*, 216 F.3d at 307; *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir.1996); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir.1995); *Shields*, 25 F.3d at 1128.

■ Plaintiffs allege that JPM Chase and its officers possessed several motives to defraud its shareholders: inflation of

IP99–0870, 2001 WL 395752, at *22 (S.D.Ind. Mar. 29, 2001) (obligating plaintiffs to exclude plausible explanations other than scienter) *with In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03 Civ. 3111, 2005 WL 225288, at *24 (S.D.N.Y. Feb. 1, 2005) ("[P]laintiffs need not foreclose all other characterizations of fact[,]" but rather "must show that [their] characterization of the events and circumstances as showing scienter is highly likely." (quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir.2002)). The Court need not resolve the dispute, because plaintiffs' complaint fails when held to the more lenient standard. Upon reading the complaint "*in toto* and most favorably to plaintiff[s]," the Court has determined that plaintiffs have failed to raise a strong inference of scienter. *Id.* (quoting *In re Complete Mgmt. Sec. Litig.*, 153 F.Supp.2d 314, 333 (S.D.N.Y.2001)).

**15.** The Second Circuit acknowledges that the "not commonly shared" limitation on motive inhibits some plaintiffs who have been genuinely defrauded from obtaining a remedy. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994). However, if commonly shared motives, such as a desire to achieve a bonus, were sufficient, then the scienter requirement would have little meaning and non-meritorious strike suits would not be properly deterred. *See id.*

the price of Chase stock in anticipation of acquiring two other financial institutions, Flemings [16] and J.P. Morgan; receipt of considerable interest and fees in connection with the prepays and the hope of marketing similar transactions to other customers; reduction of credit exposure by inducing others to invest in Enron; earning significant performance-based bonuses; and garnering substantial returns for the bank and its executives in connection with the LJM2 investments. None of these motives is legally sufficient, because, as discussed respectively below, each is a type of benefit that most corporations and corporate insiders seek.

### i. Inflation of Stock Price in Contemplation of Acquisitions

Plaintiffs claim that JPM Chase committed fraud in order to inflate its stock price in anticipation of stock-for-stock acquisitions of other financial institutions. By fraudulently causing its own stock price to rise in advance of the deals, Chase allegedly aimed to offer fewer of its own shares to its potential merger partners. In 2000, Chase bought both Flemings for $7.7 billion—$3.6 billion of which was paid in Chase stock—and JP Morgan for nearly $40 billion worth of Chase stock. (Am. Compl.¶¶ 457–58).

■ "[I]n some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter." *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir.2000) (citing *In re Time Warner Sec. Litig.*, 9 F.3d 259, 270 (2d Cir.1993)). However, generalized allegations of a desire to achieve favorable terms

in a merger or acquisition are insufficient. *See Kalnit*, 264 F.3d at 141 (explaining that "the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired[,]" and "[s]uch generalized desires do not establish scienter."); *see also AOL Time Warner Sec. and "Erisa" Litig.*, No. 02 Civ. 5575, 2004 WL 992991, at *15 (S.D.N.Y. May 5, 2004) (generalized allegations that a company sought to inflate the price of its stock to effectuate a merger insufficient to allege motive, even when coupled with allegations of corporate officers' greedy intentions to keep positions of power and "access to corporate riches").

Plaintiffs allege no specific facts relating to JPM Chase's alleged fraudulent attempt to inflate its share price in anticipation of the Flemings and JP Morgan acquisitions. In fact, plaintiffs undermine that purported motive by alleging that there had been no talks of merging between Chase and JP Morgan for nearly two years prior to mid-August of 2000. (Am.Compl.¶ 214). A number of the allegedly deceptive representations thus occurred before Chase and JP Morgan were even actively discussing the possibility of merging.[17] The unstated presumption that Chase began defrauding its own shareholders in contemplation of entering into merger talks is too nebulous to raise a strong inference of scienter.

### ii. Interest and Fees from Enron and Other Potential Clients

■ JPM Chase allegedly engaged in the charged fraud in order to continue receiving substantial interest and advisory

---

**16.** JPM Chase acquired Flemings on April 11, 2000, during the proposed class period. (*See* Am. Compl. ¶ 457).

**17.** Plaintiffs allege that there had been talk of merger between the two institutions "[d]uring the past decade" (Am.Compl.¶ 213), but that

"[n]one of these discussions progressed beyond a preliminary stage, and none had occurred for nearly two years prior to the discussions that led to the proposed merger" (*Id.* ¶ 214).

fees from Enron. (*See* Am. Compl. ¶¶ 469–83). JPM Chase also allegedly hoped to garner greater revenue by marketing its allegedly fraudulent transactions to new customers. (*See id.* ¶¶ 484–88). Generalized allegations of intent to maintain lucrative business relationships and to establish new ones do not set forth a motive for scienter purposes. *See GSC Partners CDO Fund v. Washington,* 368 F.3d 228, 238 (3d Cir.2004); *Schnell v. Conseco, Inc.,* 43 F.Supp.2d 438, 449 (S.D.N.Y.1999); *Melder v. Morris,* 27 F.3d 1097, 1104 (5th Cir.1994). The incentive to increase profit can be imputed to all corporations and their officers; it is not the type of concrete and personal benefit that suffices to plead a strong inference of scienter. *See Kalnit* 264 F.3d at 139.

Plaintiffs cite *In re Livent, Inc. Sec. Litig.,* 148 F.Supp.2d 331 (S.D.N.Y.2001), to support their argument that receipt of unusually large fees can constitute a motive for scienter purposes. That case is inapposite, however, because it involved the motive of a bank, CIBC, to defraud Livent, a company paying fees, not to defraud CIBC's own shareholders. In any event, the allegedly unusually large fees at issue here, "tens of millions of dollars" (Am. Compl. ¶ 454; *see also id.* ¶ 50),[18] do not provide a rational incentive for the alleged fraud. While allegedly attempting to defraud its shareholders, JPM Chase extended billions in credit to Enron. (*See* Am. Compl. ¶ 46). For example, JPM Chase issued Enron a $3 billion credit line in August of 2001 and a $1 billion secured credit line in November of 2001. (*Id.*). It would have been unreasonable to conceal Enron's financial weakness and put billions at risk in furtherance of a fraud that garnered tens of millions in fees. *See Shields,* 25 F.3d at 1130 ("In looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed self interest.") *In re Twinlab Corp. Sec. Litig.,* 103 F.Supp.2d 193, 206 (E.D.N.Y. 2000) ("At a minimum, the alleged purpose must be in the informed economic self-interest of the defendant."); *Atlantic Gypsum Co. v. Lloyds Int'l Corp.,* 753 F.Supp. 505, 514 (S.D.N.Y.1990) ("Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent.").

### iii. Reduction of Exposure

Plaintiffs claim that JPM Chase hid Enron's vulnerability to induce others to invest, thereby forestalling Enron's inevitable collapse. JPM Chase allegedly hoped to reduce its own exposure and to protect puts it had written on Enron's publicly traded debt. (Am.Compl.¶¶ 49–51). That purported motive depends on allegations establishing JPM Chase's knowledge of Enron's financial troubles, a fact that, as described *infra,* plaintiffs have failed to allege with requisite particularity. Plaintiffs also fail to allege facts explaining why, if it was aware of Enron's problems, JPM Chase would have continued to lend Enron billions of dollars. *See Shields,* 25 F.3d at 1130; *In re Twinlab,* 103 F.Supp.2d at 206; *Atlantic Gypsum,* 753 F.Supp. at 514. Even if JPM Chase had knowingly duped other institutions into providing capital to Enron, it would have served the interests of JPM Chase and its shareholders at the

---

**18.** Plaintiffs never allege precisely how much JPM Chase earned from engaging in prepays with Enron. Plaintiffs quote from a January 25, 2002 *Wall Street Journal* article that estimates that in the summer of 1999, JPM Chase was earning 7 or 8 percent in profit on the prepay transactions. (Am.Compl.¶ 325).

During the Senate Subcommittee hearings, Lynn Turner, Chief Accountant of the SEC from July 1998 to August 2001, testified that Wall Street institutions participated in the Enron fraud "for fees that may run into tens of millions." (*Id.* ¶ 364).

expense of those other institutions. That would not constitute a motive for JPM Chase to defraud its own shareholders. *See Kalnit,* 264 F.3d at 141 (motive to defraud for scienter purposes must involve an incentive to defraud the particular plaintiffs).

### iv. Bonuses

Plaintiffs contend that the individual defendants—Harrison and Shapiro—defrauded JPM Chase shareholders in order to receive the benefit of multimillion-dollar performance-based bonuses that were in part dependent on the amount of Enron business that JPM Chase conducted. (Am.Compl.¶¶ 462–68). Harrison allegedly received a bonus of $10 million and 237,164 shares of restricted stock in connection with the JP Morgan–Chase merger. (*Id.* ¶ 463). Shapiro allegedly received a bonus half as large as Harrison's. (*Id.*). Plaintiffs urge that these bonuses motivated the individual defendants to perpetrate the alleged fraud.

These allegations are deficient, as they involve "[m]otives that are generally possessed by most corporate directors and officers." *Kalnit,* 264 F.3d at 139; *see also Acito,* 47 F.3d at 54 ("Plaintiffs' allegation that the defendants were motivated to defraud the public because an inflated stock price would increase their compensation is without merit."). The deficiency of the alleged compensation motive is compounded by the fact that revenue generated from transactions with Enron accounted for only a minute fraction of JPM Chase's income. Therefore, the bonuses that Harrison and Shapiro received, which were tied to the value of the JPM Chase's stock, would have only been marginally impacted by Enron-related transactions.

### v. Profit from LJM2 Relationship

Plaintiffs conclusorily assert that investments in LJM2 and other similar entities gave JPM Chase "[a]dded motivation ... to help Enron cook its books." (Am. Compl.¶ 459). Plaintiffs do not allege that defendants Harrison or Shapiro held any investments in LJM2. Therefore, the alleged LJM2 motive applies only to the corporate defendant. *See Rombach v. Chang,* 355 F.3d 164, 177 (2d Cir.2004). There is no indication in the complaint of how JPM Chase's investment in LJM2 would have motivated the bank to defraud its own shareholders. Plaintiffs never address why JPM Chase would have continued to provide Enron billions of dollars in financing while perpetrating a fraud to protect an LJM2 investment worth tens of millions of dollars. *See Shields,* 25 F.3d at 1130; *In re Twinlab,* 103 F.Supp.2d at 206; *Atlantic Gypsum,* 753 F.Supp. at 514.

Plaintiffs never allege that any officer of JPM Chase profited from personal equity sales at the expense of JPM Chase shareholders. *See Rombach,* 355 F.3d at 174 (finding no motive to defraud when plaintiffs failed to plead that defendants profited from an investment). *Cf. In re Scholastic Sec. Litig.,* 252 F.3d 63, 74 (2d Cir. 2001); *Rothman,* 220 F.3d at 94; *Stevelman,* 174 F.3d at 86; *Novak,* 216 F.3d at 307–08; *Acito,* 47 F.3d at 54. Instead, plaintiffs level vague and conclusory allegations that JPM Chase officers personally benefited from investments in LJM2.[19] *Cf.*

19. The closest plaintiffs come to a specific allegation that particular JPM Chase officers possessed an interest in LJM2 is that "one of the investment partnerships established by J.P. Morgan for its senior officers, known as Sixty Wall Street Fund, L.P. ("Sixty Wall"), invested $3 million to LJM2 in 1999." (Am. Compl.¶ 460). However, there are no particular allegations that any JP Morgan executive who had an investment interest in LJM2 ultimately worked for JPM Chase, or that, if she did, she still held the investment at that time.

*Stevelman,* 174 F.3d at 85 (holding that a strong inference of scienter had not been raised when plaintiff failed to allege the percentage of their holdings in the company that officers of that company sold during the relevant period and whether the officers realized an inflated price); *see also Kalnit,* 264 F.3d at 140 (citing to *Leventhal v. Tow,* 48 F.Supp.2d 104, 115 (D.Conn.1999), and noting that in that case "plaintiff's allegations that defendants had a motive to artificially inflate stock price to get more favorable terms in stock-for-stock transactions and debentures are too generalized to establish scienter.").

There are no facts alleged indicating that any investments that JPM Chase officers might have held in LJM2 would have created an incentive for those officers to profit at the expense of JPM Chase shareholders. JPM Chase was itself invested in LJM2, and so any benefit that the officers would have realized by inflating the value of their investments in LJM2 would also have profited the bank and its shareholders.

Had plaintiffs alleged with particularity that JPM Chase officers aimed to profit from investments in LJM2, plaintiffs might have been able to establish that those officers had a motive to defraud Enron's shareholders. Plaintiffs inaccurately contend that "[i]t matters not whose shareholders or which entity JPM[ Chase] set out to defraud." (Pls.' Mem. in Opp. Mot. to Dismiss at n. 8). That misstatement of law ignores *Kalnit v. Eichler,* 264 F.3d 131, in which the Second Circuit distinguished between a company's intent to defraud another company and its intent to

defraud its own shareholders. *Kalnit* involved Media One's alleged failure to disclose material information in connection with its proposed merger with Comcast; the court explained that "any intent [on the part of Media One] to defraud Comcast cannot be conflated with an intent to defraud the shareholders [of Media One]." *Id.* at 141. Plaintiffs have failed to allege that the LJM2 investments provided JPM Chase or its officers a motive to defraud JPM Chase's shareholders.

In sum, plaintiffs have not properly alleged facts that show defendants had the motive to commit fraud. The Court now turns to an analysis of whether plaintiffs have properly pled scienter via the alternative method, i.e., "by alleging facts that constitute strong circumstantial evidence of conscious behavior or recklessness." *Novak,* 216 F.3d at 307 (quoting *Acito,* 47 F.3d at 51).

> b. *Alleging Facts That Constitute Strong Circumstantial Evidence of Conscious Misconduct or Recklessness*

Although plaintiffs have failed to plead motive and opportunity, they may still satisfy the scienter pleading requirement setting forth allegations constituting strong circumstantial evidence of conscious misconduct or recklessness. A strong inference of conscious misconduct arises when the defendants: (1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their

Even if there were JPM Chase executives with personal investments in LJM2, plaintiffs do not specify how many, if any, such individuals held interests—or the amount of those interests—in LJM2 at the time of the alleged fraudulent misrepresentations. *Cf. Stevelman v. Alias Research, Inc.,* 174 F.3d 79, 85 (2d Cir.

1999) ("[S]cienter may not be inferred 'strongly' when the alleged fraud is alleged to have benefited only a single defendant in a corporate entity."). There are no allegations that any JPM Chase officer involved in or responsible for the misrepresentations alleged in the complaint had any interest in LJM2.

public statements were not accurate; or (4) failed to check information they had a duty to monitor. *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir.2000). When, as here, the plaintiffs have failed to plead motive and opportunity, "it is still possible to plead scienter by identifying circumstances indicating conscious behavior by defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir.2001) (quoting *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987), *abrogated on other grounds by United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989)).

As explained *supra*, plaintiffs have failed to set forth allegations that any of the defendants benefited in a concrete and personal way from the purported fraud. Plaintiffs have also failed to plead with requisite particularity that any of the defendants engaged in illegal behavior. Plaintiffs urge that defendants violated the law by receiving the benefit of investing in LJM2 and by making material misstatements and omissions in disclosures to government entities and other financial institutions. The first asserted legal violation, that the investment in LJM2 constituted a "kickback" for JPM Chase officers to participate in the Enron fraud, is alleged conclusorily. Plaintiffs offer no specific allegations that defendants acted corruptly in connection with LJM2. *See United States v. McElroy*, 910 F.2d 1016, 1022 (2d Cir. 1990). The second asserted legal violation—material misstatements and omissions to government regulators or financial institutions—depends on defendants' knowledge that their misrepresentations were materially misleading, *see* 18 U.S.C. §§ 215, 1005 (both requiring intent to defraud), a fact that, as explained *infra*, plaintiffs have failed to plead with requisite particularity.

The remaining bases for conscious misconduct depend on plaintiffs' knowledge of or access to information that contradicted their public statements. Plaintiffs are obligated to satisfy the "strong circumstantial evidence standard" by " 'specifically alleg[ing] defendants' knowledge of the facts or access to information contradicting their public statements." *In re Bristol–Myers Squibb Sec. Litig.*, 312 F.Supp.2d 549, 562 (S.D.N.Y.2004) (quoting *Faulkner v. Verizon Communications, Inc.*, 189 F.Supp.2d 161, 172 (S.D.N.Y.2002)). To satisfy their pleading obligations, "plaintiffs must do more than say that … statements … were false and misleading, they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir.2004).

Plaintiffs must allege facts indicating that the statements were false and misleading at the time they were made, because fraud cannot be pled by hindsight. *See In re Carter Wallace Sec. Litig.*, 220 F.3d 36, 42 (2d Cir.2000); *Novak*, 216 F.3d at 309; *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir.1999). Plaintiffs need not allege "the exact date and time" when defendants became aware of information contrary to their statements, but plaintiffs must "supply some factual basis for the allegation that the defendants knew or should have known that the statements were false at some point during the time period alleged." *Rothman v. Gregor*, 220 F.3d 81, 91 (2d Cir.2000) (quotation marks and citation omitted).

Recklessness in the scienter context cannot be merely enhanced negligence. *See Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir.1996) ("We believe 'reckless' in these circumstances comes closer to being a lesser form of intent than merely a greater degree of ordinary negligence."). Reckless conduct is " 'at the least, conduct which is highly unreasonable and which represents an ex-

treme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Kalnit*, 264 F.3d at 142 (quoting *In re: Carter–Wallace*, 220 F.3d at 39).

The Second Circuit has outlined four limitations to the conscious misconduct variant of securities fraud scienter. First, although corporate officers may not act recklessly, they "need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Novak*, 216 F.3d at 309. Plaintiffs cannot successfully assert a recklessness claim on the grounds that "defendants should have anticipated future events and made certain disclosures earlier than they actually did." *Id.* Second, corporate officers need not be excessively gloomy or cautious as long as their statements are "consistent with reasonably available data." *Id.* Third, the failure to monitor the fraudulent behavior of others does not always amount to recklessness. *Id.* For example, "the failure of a parent company to interpret extraordinarily positive performance by its subsidiary—specifically, the 'unprecedented and dramatically increasing profitability' of a particular form of trading—as a sign of problems and thus to investigate further" does not satisfy the scienter requirements of securities fraud laws. *Id.* Fourth, allegations of GAAP violations or other accounting improprieties are not themselves enough to constitute recklessness. Only where such allegations are coupled with evidence of "corresponding fraudulent intent" may they be sufficient. *Id.* (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996)) (quotation marks omitted).

### 4. *Material Falsity of The Alleged Misstatements*

"When ... as here, information contrary to the alleged misrepresentations is al-leged to have been known by defendants at the time the misrepresentations were made, the falsity and scienter requirements are essentially combined." *See In re Globalstar Sec. Litig.*, No. 01 Civ. 1748, 2003 WL 22953163, at *5 (S.D.N.Y. Dec. 15, 2003) (quoting *In re Revlon, Inc. Sec. Litig.*, No. 99 Civ. 10192, 2001 WL 293820, at *7 (S.D.N.Y. Mar. 27, 2001) (citing *Rothman v. Gregor*, 220 F.3d 81, 89–90 (2d Cir.2000))). Therefore, below, the Court discusses conscious misconduct in conjunction with material falsity for each of the categories of alleged misstatements.

Pursuant to Section 10(b) and Rule 10b–5, a misstatement or omission is material "'if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'" *Basic, Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). "Material facts include those that affect the probable future of the company and that may affect the desire of investors to buy, sell, or hold the company's securities." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001). Materiality of any given statement, which is a mixed issue of fact and law, depends on the surrounding factual circumstances. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir.2000).

"At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b–5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino*, 228 F.3d at 162 (citing *Basic*, 485 U.S. at 231, 108 S.Ct. 978). Courts do not grant motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) on grounds of immateriality, unless the mis-

statements "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* (citing *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985)). Nevertheless, securities fraud complaints must comply with the particularity requirements of Fed.R.Civ.P. 9(b) and the PSLRA; the materiality of the alleged misstatements or omissions cannot be pled in a conclusory or general fashion. *Gavish v. Revlon,* No. 00 Civ. 7291, 2004 WL 2210269, at *16 (S.D.N.Y. Sep. 30, 2004).[20]

### a. *Allegedly Improper Accounting for the Mahonia Transactions*

■ Plaintiffs allege that defendants recorded the Mahonia transactions as trades, knowing that they were, in fact, loans. A number of facts alleged in the Amended Complaint give rise to the strong inference that JPM Chase knew or should have known that the transactions were not bona fide trades. First, JPM Chase set up the triangular trading structure between itself, an entity it controlled and Enron. The transactions allegedly eliminated price risk and entailed no actual commodity exchange. (Am.Compl.¶¶ 58–135). Second, JPM Chase communications, including a "pitch book" for generating new business, an internal email and recorded telephone calls involving JPM Chase executives, indicate that JPM Chase employees considered the prepays financing mechanisms, not trades. (*Id.* ¶¶ 58–135; 453–45; 486–87). Third, JPM Chase allegedly took the position in other litigation that its insurers had to know that the Mahonia transactions constituted financing rather than trades. (*Id.* ¶ 361). Taken together, these factual allegations raise a sufficiently strong inference that JPM Chase knew or should have known that these transactions were not bona fide trades.[21]

---

**20.** Defendants contend that many of the misstatements alleged in the complaint are immaterial as a result of the "bespeaks caution" and safe harbor doctrines. Pursuant to these doctrines, attached cautionary disclaimers may render forward-looking statements immaterial. *See Halperin v. eBanker USA.com,* 295 F.3d 352, 357 (2d Cir.2002). However, because plaintiffs have only pled scienter with respect to the characterization of alleged loans as trades—statements that are inherently backward looking—the bespeaks caution and safe harbor doctrines do not apply. *See Ruskin v. TIG Holdings, Inc.,* No. 98 Civ. 1068, 2000 WL 1154278, at *7 (S.D.N.Y. Aug. 14, 2000) ("[C]autionary language does not protect material misrepresentations or omissions when defendants knew they were false when made."); *Milman v. Box Hill Sys. Corp.,* 72 F.Supp.2d 220, 231 (S.D.N.Y.1999)("[N]o degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made."). Mischaracterizing existing loans as trades is not a generalized expression of corporate optimism that the PSLRA and the bespeaks caution doctrine protect. *See Rombach v. Chang,* 355 F.3d 164, 174 (2d Cir.2004).

**21.** In the Complaint, plaintiffs refer to Judge Rakoff's decision in *JPMorgan Chase Bank ex rel. Mahonia Ltd. v. Liberty Mutual Ins. Co.,* 189 F.Supp.2d 24 (S.D.N.Y.2002). In that action, JPM Chase sued the insurance companies that had issued the surety contracts on the Mahonia transactions. Judge Rakoff denied JPM Chase's motion for summary judgment, explaining that "evidence exists to suggest that these transactions were loans, not bona fide commodity transactions." (Am. Compl.¶ 9) (citing *JPMorgan Chase Bank ex rel. Mahonia Ltd. v. Liberty Mutual Ins. Co.,* 189 F.Supp.2d at 29). In their memorandum opposing defendants' motion to dismiss, plaintiffs in this action cite emails discussed in a later opinion in *JPMorgan Chase Bank ex rel. Mahonia Ltd. v. Liberty Mutual Ins. Co.,* No. 01 Civ. 11523, 2002 WL 31867731, at *3 (S.D.N.Y. Dec. 23, 2002). (Pls.' Mem. in Opp. Mot. Dismiss at 12–13). The complaint contains no reference to these emails, which do not constitute the sort of facts "not subject to reasonable dispute" of which the Court may properly take judicial notice. Fed.R.Evid. 201(b); *see also International Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,* 146 F.3d 66, 70 (2d Cir.1998) ("A court may take judicial notice of a document filed in

Defendants argue that in order to hold JPM Chase liable, plaintiffs may not ascribe knowledge of contradictory facts to JPM Chase generally, but rather must show that a specific corporate officer who was responsible for any given misleading statement personally possessed the required scienter. To support that argument, defendants cite to *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435–36 (9th Cir.1995), and *Piper Jaffray Companies, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 38 F.Supp.2d 771, 778–80 (D.Minn.1999). Although other cases support that view, *see, e.g., Kinsey v. Cendant Corp.*, No. 04 Civ. 0582, 2004 WL 2591946, at *13 (S.D.N.Y. Nov. 16, 2004); *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 364–66 (5th Cir.2004); *In re Apple Computer, Inc. Sec. Litig.*, 243 F.Supp.2d 1012, 1028 (N.D.Cal.2002), nothing in Rule 9(b) or the PSLRA requires a plaintiff to allege that the same individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter. *See Adams v. Kinder–Morgan, Inc.*, 340 F.3d 1083, 1106–07 (10th Cir.2003) (explaining that "[t]he scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority[,]" and collecting cases to support that proposition); *see also Shanahan v. Vallat*, No 03 Civ. 3496, 2004 WL 2937805, at *4 (S.D.N.Y. Dec. 19, 2004) (explaining that "plaintiffs are relieved of some of the burden of pleading specific defendants' specific roles in the alleged fraud by virtue of the 'group pleading doctrine,' which allows plaintiffs 'to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company.'") (quoting *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y.1999))(internal quotation marks omitted); *see also DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987) (" '[N]o specific connection between fraudulent representations in [an] Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question.'") (quoting *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986)) (citations omitted); *In re Philip Servs. Corp. Sec. Litig.*, No. 98 Civ. 0835, 2004 WL 1152501, at *16, 2004 U.S. Dist. LEXIS 9261, at *54–55 (S.D.N.Y. May 19, 2004). Plaintiffs have alleged the existence of specific JPM Chase communications that indicate that JPM Chase officers, including the Vice Chairman, a Vice President and a Managing Director, had knowledge that the Mahonia transactions were not bona fide trades. That knowledge may properly be attributed to the corporate defendant.

Plaintiffs have alleged sufficient facts to infer that defendant Shapiro knew or should have known that the Mahonia transactions were in fact loans and not trades. First, plaintiffs allege that Shapiro "was the Chase executive responsible for the bank's dealings with Enron[.]" (Am.Compl.¶ 36). In addition, plaintiffs

---

another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'") (quoting *Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir.1992)). In any event, the emails relate to the allegedly improper characterization of the Mahonia prepays as trades. Without taking judicial notice of the emails, the Court has found that plaintiffs have properly pled scienter as to that issue.

reference a specific meeting on August 5, 1999, in which Shapiro was briefed on the bank's trading with energy companies, including the fact that "one reason companies like Enron were entering the complex trades was to carry forward losses and lower tax burdens." (*Id.* ¶ 326). Allegedly, during the meeting, "Mr. Shapiro reviewed the trades and said they were fine." (*Id.*). These alleged facts, taken together, are enough for the Court to draw the strong inference that Shapiro knew or should have known that the Mahonia transactions were not bona fide trades.

 Plaintiffs offer no basis for inferring that defendant Harrison had similar knowledge that the Mahonia transactions were not bona fide trades, other than that he was the Chief Executive Officer of JPM Chase. When information is at the core of a company's business, it may be properly ascribable to senior officers. *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 490 (S.D.N.Y.2004) ("[I]f a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company."); *Epstein v. Itron, Inc.*, 993 F.Supp. 1314, 1326 (E.D.Wash.1998) ("[F]acts critical to a business' core operations or an important transaction are generally so apparent that their knowledge may be attributed to the company and its key officers.") (*abrogated on other grounds by In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir.1999)). However, plaintiffs allege no facts suggesting that the accounting treatment of the Mahonia transactions as trades rather than as loans was at the core of JPM Chase's business. *Cf. In re Federated Dep't Stores, Inc. Sec. Litig.*, No. 00 Civ. 6362, 2004 WL 444559, at *5 (S.D.N.Y. Mar. 11, 2004). Therefore, knowledge of the improper characterization of the Mahonia transactions as trades cannot properly be attributed to defendant Harrison.

With respect to defendants JPM Chase and Shapiro, plaintiffs have properly pled recklessness in the alleged mischaracterization of the Mahonia transactions as trades. Plaintiffs further contend that JPM Chase's accounting for the Mahonia transactions was misleading, because it should have reflected Enron's outstanding obligations to JPM Chase as impaired, rather than viable, assets. Allegedly, JPM Chase knew or should have known that Enron might default and that the insurance companies that had guaranteed the Mahonia transactions would refuse to perform pursuant to the surety contracts. Accordingly, plaintiffs urge, JPM Chase should have provided greater capital reserves.

Plaintiffs claim that JPM Chase should have realized the Mahonia transactions were impaired, because, as a result of providing Enron various financial services, JPM Chase had obligations to perform due diligence on Enron. (Am.Compl.¶ 505). Plaintiffs allege no specific facts, however, indicating that JPM Chase conducted its due diligence improperly. Nor have plaintiffs alleged, in anything but conclusory fashion, that JPM Chase would have conducted due diligence in a materially different manner had it accounted for the Mahonia prepays as loans rather than as trades.

 Without the support of detailed factual allegations, plaintiffs conclusorily claim that "JPM[ Chase] either knew or should have known about most, if not all, of the material Enron accounting and financial transgressions, regardless of the source of financing or origin of the investment." (*Id.* ¶ 506). The argument that

JPM Chase should have known by virtue of "its intimate knowledge of Enron's true indebtedness and its Ponzi scheme" (Pls.' Mem. in Opp. to Mot. to Dismiss at 7) does not substitute for particular allegations. Nor do conclusory claims that the transactions—which were allegedly *de facto* extensions of credit—should have received greater scrutiny that would have revealed their impairment. (Am.Compl.¶¶ 413–26).

The massive scope and effective concealment of Enron's fraud further undercut plaintiffs' conclusory claim that JPM Chase should have been aware of most or all of Enron's financial misdeeds. As the complaint explains, "Enron's prepay secrecy was so successful that, while each financial institution involved in an Enron prepay had inside knowledge of that particular transaction, it appears that no financial institution—even Chase or Citigroup—knew the total number and dollar value of all the 'prepays' engaged in by Enron." (*Id.* ¶ 361). *See Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir.2001). Enron allegedly used approximately 3,500 affiliates to effectuate off-balance sheet deals. (Am.Compl.¶ 124). As an example of how well secreted Enron's prepays were, plaintiffs cite to an October 2001 email exchange in which JPM Chase employees expressed surprise when learning that Enron had $5 billion in outstanding prepays. (*Id.* ¶ 361). That $5 billion in prepays accounted for less than one-fifth of Enron's more than $25 billion in off balance sheet debt. (*Id.* ¶¶ 316, 358).

The fact that JPM Chase engaged in extensive business dealings with Enron, including allegedly helping Enron conceal almost $4 billion in debt over several years (*Id.* ¶ 42), does not give rise to the strong inference that JPM Chase should have been aware that Enron was likely to default on the prepays. *See Rombach v. Chang,* 355 F.3d 164, 176 (2d Cir.2004)

("[A] 'pleading technique [that] couple[s] a factual statement with a conclusory allegation of fraudulent intent' is insufficient to 'support the inference that the defendants acted recklessly or with fraudulent intent.' ") (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir. 1994)). Neither does the fact that affiliates of JPM Chase may have invested in LJM2, a partnership that Enron allegedly used to hide the risk of certain assets. That those affiliates were listed as attendees at a conference in which material was disseminated indicating that Enron had assets that were not reflected on its balance sheet also fails to raise the strong inference that JPM Chase knew or should have known that the Mahonia transactions were non-performing. JPM Chase's continued provision of billions of dollars in fresh capital to Enron during the class period undermines plaintiffs' conclusory claim that JPM Chase knew or should have known Enron faced impending financial ruin. *See Atlantic Gypsum Co. v. Lloyds Int'l Corp.,* 753 F.Supp. 505, 514 (S.D.N.Y.1990).

Plaintiffs fail to allege with particularity why JPM Chase would have believed it faced a likely loss even though it had surety contracts on the prepays that guaranteed payment. Plaintiffs conclusorily charge that because JPM Chase obtained the insurance by fraudulently misrepresenting the underlying transactions as trades, it should have known that it would not actually recover on the surety contracts. The complaint fails to support this claim with particular allegations demonstrating JPM Chase's awareness that it was likely to be unable to collect. The complaint does not properly allege that the supposed misrepresentation to the insurers was material or that the insurers would successfully challenge the reimbursement.

**630**

Plaintiffs point to a colloquy during the Senate Subcommittee hearing as evidence that JPM Chase knew the Mahonia transactions were impaired. Robert W. Traband and Donald H. McCree, JPM Chase executives, testified that the bank had Enron-related exposure in excess of $2 billion by May of 2001 and that that amount increased through the fall. Plaintiffs claim those statements are inconsistent with the November 28 press release that only mentioned $500 million in unsecured exposure to Enron and $400 million in secured exposure. Plaintiffs' reasoning suffers from several flaws. First, the statements were explicitly couched in uncertain terms. Mr. Traband's comment was: "I don't recall specifically how much they owed us. But I would imagine was [sic], you know, something greater than $2 billion." (Am. Compl.¶ 493). McCree said "I don't know the question, but we actually increased our credit exposure in a number of different ways through the fall of 2001 prior to the bankruptcy." (Id.). Second, even assuming that these comments could appropriately be taken as assertions of fact, they are not inconsistent with JPM Chase's statement of exposure in the November press release. At that point, JPM Chase was insured for the remainder of its potential exposure that remained undisclosed.

■ In December of 2001, after its insurers objected to making payments pursuant to the surety contracts, JPM Chase acknowledged its contingent liability arising from the Mahonia transactions. Plaintiffs have not alleged sufficient facts to indicate that JPM Chase materially misled its shareholders by not revealing its full potential Enron exposure to the market earlier. Without showing that JPM Chase knew or should have known of the impairment of the prepays, plaintiffs have only alleged poor prognostication, which cannot support a claim for securities fraud. *See*

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir.1995) (finding no duty to anticipate and disclose possible future inspection by a regulatory agency). Plaintiffs have failed to allege facts indicating that JPM Chase knew or should have known that Enron might default or that the insurers would challenge their obligations, both of which would be necessary to give rise to a strong inference of scienter regarding the fact that the Mahonia transactions were impaired. *See In re Carter Wallace Sec. Litig.*, 220 F.3d 36, 40 (2d Cir.2000) (plaintiffs must properly allege that defendants had "access to information contradicting their public statements.").

■ Plaintiffs have only pled scienter satisfactorily with respect to the fact that the Mahonia transactions were not bona fide trades. Plaintiffs have failed to allege facts giving rise to a strong inference that defendants acted with scienter in treating the prepays as viable assets rather than impaired assets. Therefore, the Court must determine whether the alleged misrepresentations made in accounting for the prepays were material to the extent that JPM Chase cast the prepays as trades rather than loans, but not to the extent that JPM Chase accounted for those transactions as viable rather than non-performing assets.

Treating the prepays as viable loans rather than as viable trades would not have a material impact on JPM Chase's overall financial situation. It would not have involved diminishing the bank's total assets, but rather would have involved shifting a minute fraction of assets from one line—trading assets—to another—loan assets—in the asset column of JPM Chase's balance sheet. For example, in its 2000 Annual Report, JPM Chase would have re-labeled $2.3 billion (Am. Compl.¶ 246) of JPM Chase's assets, out of more than $715 billion in assets overall as

of December 31, 2000. (*See* Consolidated Balance Sheet, 2000 10–K Chase). JPM Chase's outstanding loan figure as of December 31, 2000 would have increased from approximately $212 billion to approximately $214 billion and its derivative receivables trading assets would have decreased from approximately $76 billion to approximately $74 billion. *See id.* Changing the accounting treatment of approximately 0.3% of JPM Chase's total assets from trades to loans would not have been material to investors, *see Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 546–47 (8th Cir.1997) (overstatement of assets by less than 2% was immaterial despite 50% drop in stock price); *In re Westinghouse Sec. Litig.,* 90 F.3d 696, 715 (3d Cir.1996) (1.2% overstatement of total assets not material, despite alleged 60% drop in stock price); *In re Duke Energy Corp. Sec. Litig.,* 282 F.Supp.2d 158, 161 (S.D.N.Y.2003) (allegations of manipulations involving 0.3% of a company's revenues immaterial as a matter of law).

Accounting for the prepays as trades would not have had a material effect on the information available to JPM Chase shareholders in qualitative terms; doing so would not have communicated the hidden risks inherent in those transactions. There are no allegations suggesting that had JPM Chase represented the prepays as loans it would have been more thorough in its due diligence of Enron and thereby more likely to discover Enron's financial distress. There are insufficient allegations to support the inference that the risks of these transactions would have been more visible to investors had they been reflected on the balance sheet as viable loans rather than viable trades.

Allegedly improper characterization of the Mahonia transactions as trades does not give rise to a " 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " *Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 357 (2d Cir.2002) (quoting *Basic, Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). In light of "all [the] relevant circumstances of [this] particular case," *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 162 (2d Cir.2000), the comparatively small volume of assets that should allegedly have been listed as viable loans rather than viable trades is so "obviously unimportant to a reasonable investor that reasonable minds could not differ." *Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529, 538 (2d Cir.1999).

· The Amended Complaint contains no particular factual allegations demonstrating the materiality of mischaracterizing the prepays as viable trades rather than viable loans. *See Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 116 (2d Cir. 1982); *Gavish v. Revlon,* No. 00 Civ. 7291, 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004). Therefore, in connection with that alleged mischaracterization, plaintiffs have not satisfied their obligations at the pleading stage to "alleg[e] a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino,* 228 F.3d at 162 (citing *Basic,* 485 U.S. at 231, 108 S.Ct. 978).

Plaintiffs have pled scienter satisfactorily only with respect to the mischaracterization of the prepays as viable trades rather than as viable loans, a mischaracterization that is immaterial from he standpoint of the reasonable investor, as set forth above. They have not, however, adequately alleged facts suggesting a strong inference of conscious misbehavior or recklessness in the failure to represent that the loans were impaired. Thus,

plaintiffs have failed to plead scienter adequately in connection with the alleged improper accounting for the prepays.

### b. Failure to Disclose Alleged Improprieties in Connection with the Mahonia and LJM2 Transactions

JPM Chase allegedly made material omissions in failing to disclose legal violations and diversions of corporate opportunity. Plaintiffs conclusorily assert 1) that individual officers of JPM Chase had investments in LJM2 [22] that were "kickbacks" and diversions of corporate opportunity; and 2) that JPM Chase fraudulently misrepresented the prepays to government entities and peer financial institutions.

Plaintiffs contend that JPM Chase made material omissions in failing to disclose its violations of 18 U.S.C. Sections 215 and 1005. Plaintiffs have failed to allege with particularity that JPM Chase or its agents violated these statutes. *See In re Duke Energy Corp. Sec. Litig.*, 282 F.Supp.2d 158, 162 (S.D.N.Y.2003) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)); *In re Am. Express Co. Shareholder Litig.*, 840 F.Supp. 260, 269–70 (S.D.N.Y.1993) (quoting *GAF Corp. v. Heyman*, 724 F.2d 727, 740 (2d Cir.1983)). Plaintiffs' claim that defendants violated Section 1005, which prohibits making false entries in disclosures to government entities, rests on copious speculation that JPM Chase's accounting inaccuracies were material, that it acted with the requisite mental state and that it would have been prosecuted.

The charge that JPM Chase's officers violated Sections 18 U.S.C. 1005, as well as 215, by receiving "kickbacks" in exchange for loans to Enron suffers from the same lack of support in the factual allegations. Plaintiffs claim that the benefit JPM Chase executives obtained was the opportunity to invest in LJM2 and other Enron SPEs that had unusually high rates of return for investors. Nevertheless, there are no particular factual allegations that support the conclusory assertion that these investment opportunities were provided as "kickbacks," let alone that these opportunities were offered with fraudulent intent.

Plaintiffs do not link the investment opportunities to Chase's financing of Enron. Defendants argue that "[i]t is patently frivolous to suggest that the investment by a fund for J.P. Morgan & Co. employees was 'given' in exchange for loans provided by Chase, which was then [in 1999] a wholly separate entity and indeed a staunch rival of J.P. Morgan & Co." (Mem. Supp. Mot. to Dismiss at 22). Although in their memorandum plaintiffs contend that it was the continuing receipt of returns from the investment that constituted the "kickback" (*see* Pls.' Mem. in Opp. Mot. to Dismiss at 31), plaintiffs do not plead specific facts to that effect in the Amended Complaint.

Plaintiffs claim that JPM Chase not only failed to disclose legal violations, but also that JPM Chase executives diverted corporate opportunities by making personal investments in LJM2. Plaintiffs allege no facts supporting the generalized assertion that JPM Chase officers diverted corporate opportunities. Even if there were diversions of corporate opportunity, plaintiffs fail to allege facts indicating that they were material. (Am. Compl. ¶ 43; *see also id.* at ¶ 116).

### c. Representations Regarding Integrity and Risk Management

Plaintiffs allege that JPM Chase misrepresented itself as an institution of

22. *See supra* § II.C.3.a.v.

integrity with sound risk-management procedures. The particular misstatements that plaintiffs allege—generalizations regarding integrity, fiscal discipline and risk management—amount to no more than puffery. *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir.1996) (per curiam) (statements that a company refused to "compromise its financial integrity," that it had a "commitment to create earnings opportunities" and that these "business strategies [would] lead to continued prosperity" constituted "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable") (quotation marks omitted); *In re Kidder Peabody Sec. Litig.*, 10 F.Supp.2d 398, 413 n. 15 (S.D.N.Y.1998) (statements relating to defendants' " 'culture,' 'cost controls,' 'integrity,' 'strategic planning,' and 'personal accountability' " were puffery.); *see also In re Salomon Inc. Sec. Litig.*, No. 91 Civ. 5442, 1994 WL 265917, at *9 (S.D.N.Y. June 16, 1994).

Even if defendants' statements were more than puffery, plaintiffs have failed to allege adequately that the assertions were materially misleading. As set forth above, the inaccuracy for which plaintiffs have adequately pled scienter—the characterization of the Mahonia transactions as trades rather than as loans—was itself immaterial. Therefore, that mischaracterization does not render the bank's representations of its own integrity and risk management materially misleading.

#### d. Analysts' Buy Ratings for Enron Stock

█ Plaintiffs claim that JPM Chase analysts rated Enron stock a "buy" despite JPM Chase's knowledge that Enron's earnings were non-sustainable. Plaintiffs allege that the analysts issued these recommendations in an attempt to inflate Enron's stock price and avert JPM Chase's exposure that would result from Enron's collapse.

Plaintiffs must allege " 'with particularity' 'provable facts' to demonstrate that the statement of opinion is both objectively and subjectively false." *Podany v. Robertson Stephens, Inc.*, 318 F.Supp.2d 146, 154 (S.D.N.Y.2004) (citing *Bond Opportunity Fund v. Unilab Corp.*, No. 99 Civ. 11074, 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003)). There are no particular facts alleged suggesting that JPM Chase or the individual analysts believed these "buy" ratings to be false at the time they were issued. *Cf. In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 392, 424 (S.D.N.Y. 2004) (In a case involving similar allegations that analysts knowingly issued false reports to preserve investment banking relationships, plaintiffs alleged the falsity of an analyst's purported opinion by including details about the analyst's close relationship with WorldCom, his unusual method of valuing the company, specific statements that senior management was aware of problems with the accuracy of the analyst reports, and allegations that analyst reports were corrupted by pressure from investment bankers at the same bank). Plaintiffs have also not offered any specific allegations of contemporaneous institutional knowledge at JPM Chase that rendered these ratings false, nor any basis for ascribing that knowledge, if it existed, to the relevant analysts.

In any event, plaintiffs have not properly pled that the analysts' "buy" ratings on Enron altered the "total mix of information" available to JPM Chase shareholders. Even if the analysts knew that the reports were false and created them to mask Enron's genuine financial condition—facts that plaintiffs fail to plead with particularity—more accurate reports would not necessarily have provided JPM Chase shareholders material information about how

Enron's vulnerability would impact the price of JPM Chase stock. For example, changing the rating on Enron stock to "sell" might have been material to Enron shareholders, but plaintiffs do not properly allege how that would have altered the total mix of information available to JPM Chase shareholders.

### e. JPM Chase's Alleged Downplaying of Its Enron-related Exposure

Plaintiffs claim that JPM Chase delayed acknowledging the true extent of its Enron-related exposure. In a November, 2001 press release, JPM Chase disclosed $500 million in unsecured transactions and $400 million in secured transactions that were outstanding from Enron to JPM Chase. In that press release, JPM Chase did not divulge the existence of significant insured liabilities, which were later disclosed in a December press release issued after the insurers challenged the surety contracts. Plaintiffs charge that the November press release failed to reveal the full extent of JPM Chase's exposure and did not communicate the threat to JPM Chase's reputation associated with the bank's participation in Enron's fraud. The November press release did not contain a material falsehood, because the Mahonia transactions were insured. *See Levine v. NL Indus., Inc.*, 926 F.2d 199, 203 (2d Cir.1991) (failure to disclose exposure was not material because the Department of Energy had agreed to indemnify the defendant against loss). Plaintiffs have only offered conclusory allegations that JPM Chase should have known that the insurers would challenge those contracts or that those challenges might be successful.

In addition to the press release, JPM Chase allegedly made various statements meant to downplay its Enron-related exposure. These included comments relating to JPM Chase's purported belief that it acted appropriately in its dealings with Enron and that it expected to receive payment from its insurers in the litigation over the Mahonia surety contracts. Plaintiffs have only conclusorily alleged that the defendants obtained the surety contracts fraudulently. No particularized allegations indicate that JPM Chase's alleged statements downplaying its Enron-related exposure were false when made or that they constituted more than immaterial puffery.

### 5. Dismissal of the Section 10(b) Claim

As set forth above, plaintiffs have adequately pled scienter only with respect to whether the prepays were improperly characterized as trades rather than loans, a distinction that would have not have been material to reasonable investors. Plaintiffs have not adequately pled scienter in regard to whether the transactions—however they were characterized—were impaired. Because plaintiffs have failed to adequately plead scienter in connection with any material misstatements or omissions, their Section 10(b) claim must be dismissed for failure to comply with the pleading requirements of Fed.R.Civ.P. 9(b) and the PSLRA.

■■■ Plaintiffs' failure to state a claim for underlying liability eviscerates their control person liability claim pursuant to Section 20 of the Exchange Act. *See Marcus v. Frome*, 275 F.Supp.2d 496, 503 (S.D.N.Y.2003) (To make out a prima facie case under Section 20(a) a plaintiff "must show a primary violation [of the Exchange Act] by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person.") (quoting *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d

1450, 1472 (2d Cir.1996) (quotations and internal alterations omitted)).

### D. Section 11 of the Securities Act

■ Section 11 of the Securities Act provides that a signer of a registration statement will be liable when the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k. In order to state a claim pursuant to Section 11, a plaintiff must allege facts "demonstrating the defendant possessed the omitted information at the time the registration statement became effective and that the defendant had a duty to disclose that information." *See, e.g., Scibelli v. Roth,* No. 98 Civ. 7228, 2000 WL 122193, at *3 (S.D.N.Y. Jan. 31, 2000); *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 308 F.Supp.2d 249, 254 (S.D.N.Y.2004).

■ The Second Circuit has recently held that plaintiffs must comply with the pleading requirements of Fed.R.Civ.P. 9(b) when alleging violations of Section 11 that sound in fraud, even though the statutory provisions only requires a mental state of negligence. *see Rombach v. Chang,* 355 F.3d 164, 171 (2d Cir.2004). Plaintiffs cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness. *See id.* at 170. The Second Circuit in *Rombach* explained that "[t]he wording and imputations of the complaint are classically associated with fraud" when plaintiffs allege that the registration statement "contained 'untrue statements of material facts' and that 'materially false and misleading' statements were issued." *Id.*

Similarly here, plaintiffs have alleged more than mere negligence—the entire complaint sounds in fraud. Despite their disclaimer of any claim of fraud with re-

spect to the Section 11 claim (Am. Compl.¶ 556), the heightened pleading standards of Fed.R.Civ.P. 9(b) apply. *See Rombach,* 355 F.3d at 171; *see also In re AOL Time Warner, Inc. Sec. Litig.,* No. 02 Civ. 5575, 2004 WL 992991 at *11 (S.D.N.Y. May 5, 2004). As explained *supra,* plaintiffs have failed to plead a strong inference of scienter properly.

Plaintiffs have failed to plead facts suggesting that any of the misrepresentations alleged in the complaint were both material and false when made. The only alleged falsity that plaintiffs have pled with particularity is that the Mahonia transactions were represented as trades. However, as discussed above, that improper designation alone is not material.

In contravention of Fed.R.Civ.P. 9(b) and the PSLRA, plaintiffs have failed to plead with particularity a strong inference of scienter in connection with a material misrepresentation or omission. Plaintiffs' Section 11 claim is dismissed.

### E. Section 15 of the Securities Act

Section 15 of the Securities Act, 15 U.S.C. § 77o, provides that liability can be imposed upon "controlling persons" for violations of the Securities Act by persons controlled by those controlling persons. *See In re AOL Time Warner, Inc. Sec. Litig.,* No. 02 Civ. 5575, 2004 WL 992991 at *28 (S.D.N.Y. May 5, 2004) (citing *HB Holdings Corp. v. Scovill, Inc.,* No. 88 Civ. 7982, 1990 WL 37869 (S.D.N.Y. Mar. 26, 1990)). To withstand a motion to dismiss, plaintiffs must allege, *inter alia,* an underlying violation by the controlled person. *Id.; see also Suez Equity Investors, L.P. v. Toronto Dominion Bank,* 250 F.3d 87, 101 (2d Cir.2001); *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998). Plaintiffs have failed to state a claim for an underlying violation of the Securities Act. Therefore, their claim for controlling-person lia-

bility on the part of defendant Harrison is dismissed.

### F. Section 14(a) of the Exchange Act

Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), requires that proxy solicitation materials conform to the rules promulgated by the S.E.C. One such rule, Rule 14a–9(a) provides that "[n]o solicitation subject to this regulation shall be made by means of any proxy statement ... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a–9(a). To state a claim pursuant to these provisions, plaintiffs must show: "(1) the proxy statement contained a material misstatement or omission, which (2) caused plaintiff's injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." See Bond Opportunity Fund v. Unilab Corp., No. 99 Civ. 11074, 2003 WL 21058251, at *3 (S.D.N.Y. May 9, 2003). Plaintiffs must also allege that defendants acted at least with negligence in making the misrepresentation or omission. See id. at *4.

There is no requirement in the Second Circuit that plaintiffs allege fraud in order to state a cause of action pursuant to Section 14(a). See Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1301 n. 20 (2d Cir.1973). Here, however, plaintiffs' Section 14(a) claim rests on the same charges of fraudulent conduct as their Section 10(b) claim. (Am.Compl.¶ 573). The reasoning of Rombach v. Chang, 355 F.3d 164 (2d Cir.2004), that extends Rule 9(b) particularity requirements to Section 11 claims, applies with equal force to claims brought pursuant to Section 14(a). See Cal. Pub. Employees Ret. Sys. v. Chubb Corp., 394 F.3d 126, 144 (3d Cir.2004); In re U.S. Office Prods. Sec. Litig., 326 F.Supp.2d 68, 80 (D.D.C.2004). When plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are subject to heightened pleading requirements, see id., even if they disclaim reliance on a fraud theory, see Rombach v. Chang, 355 F.3d 164, 170 (2d Cir.2004). As explained supra, plaintiffs have failed to plead a strong inference of scienter in connection with a material misrepresentation or omission.

Even if plaintiffs had not brought a Section 14(a) claim sounding in fraud, pursuant to the PSLRA, 15 U.S.C. § 78u–4(b)(1), they would still have had to plead facts indicating why the alleged misrepresentations were misleading. See 15 U.S.C. § 78u–4(b)(1). Plaintiffs have not properly pled facts suggesting that any of the assertions in the proxy statement were material misrepresentations or omissions when issued.

Plaintiffs have failed to plead with particularity the requisite mental state in connection with a material misrepresentation or omission. Plaintiffs' Section 14(a) claim is dismissed.

### III. CONCLUSION

Plaintiffs have only pled scienter with particularity in connection with the fact that JPM Chase's prepay transactions with Enron were characterized improperly as trading assets rather than as loan assets. However, that distinction alone would not have been material to investors. Plaintiffs have not properly pled scienter with respect to JPM Chase's failure to treat the prepays as impaired assets rather than as viable assets. Consequently, defendants' motion to dismiss the complaint is granted without prejudice. Plaintiffs may serve

and file a second amended complaint on or before April 29, 2005.

SO ORDERED.